STATE, Appellant, *v.* SAFEWAY STORES, INC., Respondent.

(No. 7,744.)

(Submitted January 6, 1938. Decided January 31, 1938.)

[76 Pac. (2d) 81.]

184

*Mr. Harrison J. Freebourn,* Attorney General, and *Mr. Enor K. Matson,* First Assistant Attorney General, for Appellant,

submitted an original and a reply brief; *Mr. Matson* argued the cause orally.

*Mr. T. J. Davis* and *Messrs. O'Connor & Fitzgerald,* for Respondent, submitted an original and a supplemental brief; *Mr. Davis* and *Mr. D. B. Fitzgerald* argued the cause orally.

192

*Mr. Wellington D. Rankin* and *Mr. Arthur P. Archer*, Attorneys for the Montana State Federation of Labor, appearing as

*Amici Curiae,* submitted a brief; *Mr. Rankin* argued the cause orally.

196

*Mr. S. C. Ford* and *Mr. Sam D. Goza, Jr., Amici Curiae,* submitted a brief.

MR. JUSTICE STEWART delivered the opinion of the court.

The state has appealed from an order sustaining a demurrer to an information and challenges the correctness of the trial court's ruling.

The information charges a violation of section 3073.1, Revised Codes, which provides as follows: "A period of eight (8) hours shall constitute a day's work and a period of not to exceed forty-eight (48) hours shall constitute a week's work in all cities and towns having a population of twenty-five hundred (2500) or over, for all persons employed in retail stores, and in all leased businesses where the lessor dictates the price, also kind of merchandise that is sold, and the hours and conditions of operation of the business, all persons employed in delivering goods sold in such stores, all persons employed in wholesale warehouses used for supplying retail establishments with

goods, and all persons employed in delivering goods to retail establishments from such wholesale warehouses.''

The defendant was charged with having worked one of its employees for more than eight hours in one day in a retail store in a city having a population in excess of 2,500 persons. The demurrer was on the ground that the information did not state a public offense. The court's ruling thereon presents the main assignment of error.

Defendant asserts that this court is without authority to consider the appeal because the state has failed to furnish a proper record, and that the time for preparing such a record has passed. The transcript consists of the information, demurrer, ruling on demurrer, notice of appeal, copy of minute entries and certificate of the clerk. In this respect we are confronted with practically the same record that was before the court in the case of *State* v. *Libby Yards Co.*, 58 Mont. 444, 193 Pac. 394. The court decided in that case that it was without authority to consider the appeal because it had not been perfected in accordance with the mandatory provisions of the then controlling section 9347, Revised Codes of 1907, requiring that the information, demurrer, and ruling thereon be presented in a bill of exceptions duly settled and allowed. That statute purported to outline the only method of appeal in a criminal case. The year following that decision, the section was amended, and as amended has been carried forward into our present Code as section 12045, reading in part as follows: ''The record on appeal in a criminal case shall consist of the judgment-roll as defined in section 12074 of this code, a copy of the notice of appeal and all bills of exceptions settled and filed in the case.'' (See *State* v. *Nilan,* 75 Mont. 397, 243 Pac. 1081.) To the effect that an order sustaining a demurrer constitutes a judgment, see section 11901, Revised Codes; *State* v. *Atlas,* 75 Mont. 547, 549, 244 Pac. 477; *State* v. *Libby Yards Co.*, supra; *State* v. *Nilan,* supra.

It is at once obvious from the record that all the papers enumerated by section 12074, supra, as constituting the judgment roll, are now before this court with the exception of

"charges given or refused, and the indorsements thereon." The cause having reached only the demurrer stage, such papers necessarily would not be in existence. For the same reason bills of exceptions, as contemplated by section 12042, Revised Codes, were not settled.

Finally, section 12041, Revised Codes, provides that no exception need be taken to the court's ruling on demurrer (sec. 12038, Id.), and, therefore, a bill of exceptions on that point would serve no purpose where the demurrer and ruling thereon are already included as part of the judgment roll.

We can understand the result reached in *State* v. *Libby Yards Co.*, supra, under section 9347, Revised Codes of 1907, as it then read, but cannot reconcile the decision with that section as it reads today (sec. 12045, Rev. Codes). *State* v. *Carmichael*, 62 Mont. 159, 204 Pac. 362, however, in so far as it purports to follow the view of the *Libby Case*, supra, is inexplainable in view of the fact that it was decided after the statute upon which the *Libby Case* was predicated, had been amended.

To say that this appeal can only be presented by a bill of exceptions would do violence to the plain meaning of section 12045, supra, which, construed with section 12074, would seem to contemplate such a bill only when same had of necessity been settled. The suggested procedure would be an idle act (sec. 8761, Rev. Codes), which, if required, would in effect add nothing to the record but the signature of the trial judge.

The important question for review is the constitutionality of section 3073.1, Revised Codes, under the Fourteenth Amendment to the United States Constitution, and section 27 of Article III of the Constitution of the state of Montana.

Section 3073.1 was enacted at the Extraordinary Session of the Legislature of 1933–34, as section 1 of Chapter 8, page 37. The enactment was in conformity with a specific recommendation of the Governor as contained in his proclamation convening the session.

At the regular legislative session of 1935, a proposed constitutional amendment was submitted to the qualified electors to be voted upon at the general election of 1936. The amend-

ment related to section 4, Article XVIII of the Constitution of Montana, having to do with the general subject of labor (see Chapter 172, Laws of 1935, p. 352). The amendment was adopted by the people and reads as follows: "A period of eight hours shall constitute a day's work in all industries, occupations, undertakings and employments, except farming and stock raising; provided, however, that the Legislative Assembly may by law reduce the number of hours constituting a day's work whenever in its opinion a reduction will better promote the general welfare, but it shall have no authority to increase the number of hours constituting a day's work beyond that herein provided."

Thus the public policy of the state was expressed by the people in official manner. The amendment became a part of the Article dealing with labor. By virtue of section 5 of that Article the legislature is directed to provide for the enforcement of the provisions thereof by appropriate legislation.

The section did not attempt to set up methods of enforcement, or provide penalties for violation thereof. We are not here called upon to decide whether the provision is self-executing. The information was drawn under section 3073.1, supra, though the charged violation occurred after the adoption of the constitutional amendment. Counsel for both sides stated that in their view the amendment is without controlling effect upon the constitutional questions involved here. We concur in that view, but do ascribe to it some significance in the sense that it served to disclose the existence of a public purpose or policy of the state.

Defendant takes the position that the statute infringes the liberty of contract between employer and employee concerning working hours, and deprives it of property without due process of law, and that it is denied the equal protection of the laws by reason of an arbitrary discrimination in the guise of reasonable classification. In disposing of these contentions, we must do so in the light of the well-established rule that every possible presumption must be indulged in favor of the constitutionality of the Act. (*State ex rel. Sparling* v. *Hitsman,* 99 Mont. 521, 526, 44 Pac. (2d) 747; *State ex rel.*

*Du Fresne* v. *Leslie,* 100 Mont. 449, 454, 50 Pac. (2d) 959, 101 A. L. R. 1329.)

We enter upon a discussion of the question aided by exhaustive briefs of counsel and *amici curiae,* as to the history of minimum wage and maximum hour decisions of the United States Supreme Court and of the various states.

The law was passed by the legislature in the exercise of the sovereign police powers inherent in state governments. For a discussion and illustration of such powers, see *Cunningham* v. *Northwestern Improvement Co.,* 44 Mont. 180, 206, 119 Pac. 554; *State* v. *Loomis,* 75 Mont. 88, 98, 242 Pac. 344; *Herlihy* v. *Donohue,* 52 Mont. 601, 610, 161 Pac. 164, Ann. Cas. 1917C, 29, L. R. A. 1917B, 702; *Freeman* v. *Board of Adjustment,* 97 Mont. 342, 34 Pac. (2d) 534. Whether it was designed to promote specifically order, safety, health, morals, public prosperity, or simply the general welfare of the state, does not appear by way of preface to the Act or anything expressly contained therein. Just what the exact object was can only be deduced from the existing conditions under which the Act was passed, and the events transpiring thereafter—all in the light of the constitutional powers of the legislative branch of the government.

The law was passed, as observed above, at the extraordinary session of the legislature of 1933–34. The Governor in his proclamation recited that a nation-wide depression had created a serious emergency in the state, due to a wide-spread unemployment, and detailed many reasons necessitating a special session to meet the emergent conditions. (Twenty-third Legislative Assembly, Extraordinary Session 1933–34, p. 1.) One of the recommendations to the legislature was: ''To enact a law limiting the hours of labor.''

While we do not know the exact reasons that dictated the law in its particular form and scope, it is clear that in pursuance of one of the express purposes of the special session, the manifest intent of the law was to make eight hours a regular day's labor for employees in retail stores and certain kindred occupations in cities having a population of 2,500 or over.

No one can say positively whether the Act was passed in an attempt to adjust unemployment by creating more jobs, to promote health, or whether it was simply for the general prosperity and welfare of the state as a whole. The object may well have been a combination of all such purposes. We are not called upon to say precisely what the object really was, so long as any of these purposes might reasonably have been accomplished by the Act. The problem was squarely met by the Supreme Court of the United States in *Bunting* v. *Oregon*, 243 U. S. 426, 37 Sup. Ct. 435, 437, 61 L. Ed. 830, Ann. Cas. 1918A, 1043, which is particularly apt here, in view of the fact that it dealt with a maximum hour law relating to the employment of both men and women in mills, factories, and manufacturing establishments. There it was said: "But we need not cast about for reasons for the legislative judgment. We are not required to be sure of the precise reasons for its exercise or be convinced of the wisdom of its exercise. (*Rast* v. *Van Deman & Lewis Co.*, 240 U. S. 342, 365, 36 Sup. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421 [Ann. Cas. 1917B, 455].) It is enough for our decision if the legislation under review was passed in the exercise of an admitted power of government; and that it is not as complete as it might be, not as rigid in its prohibitions as it might be, gives, perhaps, evasion too much play, is lighter in its penalties than it might be, is no impeachment of its legality. This may be a blemish, giving opportunity for criticism and difference in characterization, but the constitutional validity of legislation cannot be determined by the degree of exactness of its provisions or remedies. New policies are usually tentative in their beginnings, advance in firmness as they advance in acceptance. They do not at a particular moment of time spring full-perfect in extent or means from the legislative brain. Time may be necessary to fashion them to precedent customs and conditions, as they justify themselves or otherwise they pass from militancy to triumph or from question to repeal."

Defendant contends that there is no legitimate object in the law justifying the exercise of the police power, and it is particularly challenged as having no reasonable relation to the

health of those within the purview of the statute. There are no facts before us supporting the contention, and against it is the judgment of the legislature exercised at the time and the judgment of the people themselves later voiced in their approval of the constitutional amendment of 1936, declaring a general state policy in the matter of an eight-hour day in all occupations and fields of endeavor other than farming and stock raising.

By means of the amendment a general policy of the state was declared, and that, in the light of the economic conditions prevailing at the time the law was enacted, is a persuasive factor in the matter of the constitutionality of the Act. The United States Supreme Court, in *Nebbia* v. *New York*, 291 U. S. 502, 537, 54 Sup. Ct. 505, 516, 78 L. Ed. 940, 89 L. R. A. 1469, correctly stated the reason behind this type of legislation, as follows: "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*."

The same court further voiced its approval of the technique applied in the *Nebbia Case*, supra, in the more recent case of *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379, 57 Sup. Ct. 578, 585, 81 L. Ed. 703, 108 A. L. R. 1330. While that case dealt with a minimum wage law, the language throughout the decision is impelling to the effect that the principles there announced are equally applicable to maximum hour regulation The court, in dealing with the powers of the legislature, said: "The legislature had the right to consider that its minimum wage requirements would be an important aid in carrying out its policy of protection. The adoption of similar requirements by many

states evidences a deep-seated conviction both as to the presence of the evil and as to the means adapted to check it. Legislative response to that conviction cannot be regarded as arbitrary or capricious and that is all we have to decide. Even if the wisdom of the policy be regarded as debatable and its effects uncertain, still the Legislature is entitled to its judgment.'' The court ■ made further observations as to how it could take judicial notice of current economic conditions, which principles we think are likewise applicable to maximum hour regulation, as was recognized by Chief Justice Taft in his dissenting opinion in *Adkins* v. *Children's Hospital,* 261 U. S. 525, at page 564, 43 Sup. Ct. 394, 403, 67 L. Ed. 785, 24 A. L. R. 1238, wherein he said: ''One is the multiplier and the other the multiplicand.'' And as was also recognized in a dissenting opinion by Justice Holmes in the same case (261 U. S. 525, at page 569) to the effect that ''the bargain is equally affected which ever half you regulate.''

In view of these precedents we are unable to say that defend- ■ ant has been deprived of either liberty to contract or property without due process of law. That liberty is necessarily subordinate to reasonable restraint and regulation by the state in the exercise of its sovereign prerogative—police power. Chief Justice Hughes, in the *West Coast Hotel Case,* supra, very ably defined liberty as contemplated and safeguarded by the Fourteenth Amendment, as follows: ''What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people. Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process. This essential limitation of liberty in general governs freedom of contract in particular.

More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described. 'But it was recognized in the cases cited, as in many others, that freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' (*Chicago, B. & Q. R. Co.* v. *McGuire*, 219 U. S. 549, 565, 31 Sup. Ct. 259, 55 L. Ed. 328 [337].)''

Defendant also contends that it has been deprived of the equal protection of the laws. It is argued that the statute constitutes arbitrary discrimination rather than reasonable classification. It must be remembered that in the matter of classification, the legislature enjoys broad discretion and is not required to go as far as it might in enacting a law. The question of classification is primarily for the legislature. The presumption is that it acted on legitimate grounds of distinction, if any such grounds existed. (6 R. C. L., sec. 376, p. 364; *State* v. *Loomis,* supra; *Hilger* v. *Moore,* 56 Mont. 146, 182 Pac. 477.)

The constitutional safeguard against unjust discrimination in legislation of this type is well defined by the decisions everywhere, and that is, that the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. (*Mills* v. *State Board of Equalization,* 97 Mont. 13, 31, 33 Pac. (2d) 563.)

It must be noted that there are no facts or record before this court throwing any authenticated light on the question. We have the statute, coupled with the judicial notice which we may take of the economic conditions prevailing at the time of its

enactment. These conditions still persisted in 1935 when the legislature submitted the general eight-hour day amendment to the people for approval, and they were still existent at the time the amendment was adopted.

What a court may think as to the wisdom or expediency of the legislation is beside the question and does not go to the constitutionality of the statute. We must assume that the legislature was in a position and had the power to pass upon the wisdom of the enactment, and in the absence of an affirmative showing that there was no valid reason behind the classification, we are powerless to disturb it. As was said in the case of *Missouri, R. & T. R. Co.* v. *May,* 194 U. S. 267, at page 269, 24 Sup. Ct. 638, 639, 48 L. Ed. 971: ''When a state legislature has declared that, in its opinion, policy requires a certain measure, its action should not be disturbed by the courts under the 14th Amendment, unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched.''

Approaching the question in this manner, as we must, we cannot say that the classification was not justified. It must be presumed that the legislature had all of the particular and controlling facts before it when it made the classification of cities to be affected by the Act on the basis of population. (6 R. C. L., sec. 380, p. 388; *Radice* v. *New York,* 264 U. S. 292, 44 Sup. Ct. 325, 68 L. Ed. 690.) On this phase of the question we again quote with approval from the *West Coast Hotel Case,* supra, wherein the court said: ''This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' If 'the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.' There is no 'doctrinaire requirement' that the legislation should be couched in all embracing terms. [Citing

206

cases.]'' (See, also, *State* v. *Loomis,* 75 Mont. 88, at page 95, 242 Pac. 344.)

We are not impressed with the contention that the statute is ▉ too indefinite to be enforceable. When section 3073.1 is read in connection with the two sections immediately following it, one of which provides the penalties for violation of the Act, and the other providing for certain exceptions, the meaning of the statute and intent of the legislature are too plain to admit of doubt.

For the foregoing reasons, our conclusion is that the statute is constitutional under the Fourteenth Amendment to the Constitution of the United States. The same principles and authorities likewise lead to the conclusion that the statute is not in conflict with section 27, Article III, of our state Constitution.

The order sustaining the demurrer is reversed and the cause remanded for further proceedings in the district court.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES ANDERSON, MORRIS and ANGSTMAN concur.