RUTHERFORD, Plaintiff, v. CITY OF GREAT FALLS
ET AL., DEFENDANTS.

(No. 7,909.)

(Submitted January 4, 1939.   Decided January 21, 1939.)

[86 Pac. (2d) 656.]

*Mr. J. W. Speer,* for Plaintiff, submitted a brief, and argued the cause orally.

*Mr. Paul J. Murphy,* City Attorney of the City of Great Falls, and *Mr. John L. Slattery,* Attorney for the Great Falls Housing Authority, for Defendants, submitted a brief; *Mr. Slattery* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an original suit by a taxpayer to enjoin the city of Great Falls and the Great Falls Housing Authority from proceeding further under the provisions of Chapters 138 and 140 of the Session Laws of 1935 (secs. 5309.1 to 5309.34, Rev. Codes). Chapter 138 is known as the Housing Cooperation Law, and Chapter 140 the Housing Authorities Law. The complaint attacks the constitutionality of both Acts, as well as the proceedings already taken thereunder. Defendants have appeared by a joint general demurrer to the complaint.

The chapters in question are similar to those enacted in thirty or more states, Hawaii and Puerto Rico. All are aimed toward the promotion of low rent housing or slum clearance in cities and towns of specified sizes. Broadly stated, the two Acts, which for convenience will be discussed together as constituting the Housing Authority, provide:

That any city of the first or second class may set up an authority which shall be a public body, and a body corporate and politic, with power to investigate and study living and housing conditions in the city and to plan and carry out projects for the clearing, replanning and reconstruction of slum areas, and to provide safe and sanitary housing accommodations at reasonable rentals for persons of low income. It is empowered, under certain limitations, to issue and sell bonds which, however, shall not be a debt of the state nor of the city; and it may not in

any manner pledge the credit of the state or city, or impose upon either any obligation.

The bonds are to be of two types. One is payable from the income and revenues of a housing project without the credit of the authority being pledged for payment; payment of the other type of bond has the pledge or credit of the authority and may be additionally secured by a pledge of its revenues or by a mortgage of property and revenues of the authority. It is granted the power of eminent domain to be exercised as provided, and its property and securities are apparently exempted from the payment of taxes. The state, county, city or municipality, or any subdivision, is empowered to cooperate with the Housing Authority in essential ways, such as: To grant, sell or lease property; maintain parks, playgrounds, sewage, water and other facilities adjacent to or in connection with housing projects; provide suitable streets, sidewalks, alleys, etc., and to rezone and change the city map in conformity with housing projects.

The complaint sets forth numerous particulars in which the Housing Act allegedly contravenes certain provisions of our Constitution. In the main, each and all of the objections raised must inevitably turn upon the question whether the ultimate result sought to be obtained by the legislation constitutes a public use or purpose. The most important objections are as follows:

A. The Act unlawfully vests the power of eminent domain in the Housing Authority to acquire private property for purposes and uses which are private and not public.

B. It unconstitutionally purports to exempt the property and securities of the Authority from all taxation.

C. It empowers a city unconstitutionally to loan its credit and make donations.

D. It constitutes special or class legislation for the benefit of one class of persons to the exclusion of all others.

E. It fails sufficiently to define the class of persons (those of low income) permitted to occupy the housing accommodations, or to set up sufficient standards to guide the Housing

Authority in the selection of tenants, and, therefore, unconstitutionally attempts to delegate legislative authority to the commission of the Housing Authority.

F. That the contract of cooperation entered into between the city and the City Housing Authority is invalid and void.

It is only fair to say at the outset that all of the objections raised against the constitutionality of the Housing Law have been passed upon by the supreme courts of other jurisdictions with respect to similar legislation, and the legislation has been uniformly upheld. We do not assume to say that in each of those jurisdictions the constitutional provisions involved are exactly the same as ours, but a similarity in principle exists sufficient to give to those analogous cases controlling effect here. Likewise, we do not propose to go into detail in passing on the points raised because, at best, our decision would necessarily be but a repetition of what has already been ably said in the following decisions, on which we are content to rest this decision: *Dornan* v. *Philadelphia Housing Authority,* 331 Pa. 209, 200 Atl. 834; *Spahn* v. *Stewart,* 268 Ky. 97, 103 S. W. (2d) 651; *Wells* v. *Housing Authority,* 213 N. C. 744, 197 S. E. 693; *State ex rel. Porterie* v. *Housing Authority of New Orleans,* 190 La. 710, 182 So. 725; *New York City Housing Authority* v. *Muller,* 270 N. Y. 333, 1 N. E. (2d) 153, 105 A. L. R. 905; *Marvin* v. *Housing Authority of Jacksonville,* (Fla.) 183 So. 145; *Williamson* v. *Housing Authority of Augusta,* (Ga.) 199 S. E. 43; *McNulty* v. *Owens,* 188 S. C. 377, 199 S. E. 425; *In re Opinion of the Justices,* 235 Ala. 485, 179 So. 535.

In enacting the law the legislature made certain findings of fact upon the basis of which it determined and declared the necessity in the public interest of the provisions enacted, and that the objects thereof were "public uses and purposes for which public money may be spent and private property acquired." (Sec. 1, Chap. 138; sec. 2, Chap. 140.) It is obvious that the law was passed in the exercise of the sovereign police powers inherent in state governments. (*State* v. *Safeway Stores, Inc.,* 106 Mont. 182, 76 Pac. (2d) 81.) It is equally clear from a reading of the findings and declarations of necessity

set out in both Acts that the legislature considered that it was enacting laws involving a public purpose. Legislation having for its purpose the eradication of slums and the substitution in place thereof of safe and sanitary dwellings is well within the definition of "public purpose" as defined in *Green* v. *Frazier*, 44 N. D. 395, 176 N. W. 11, affirmed by the United States Supreme Court in 253 U. S. 233, 40 Sup. Ct. 499, 64 L. Ed. 878, as follows: "A public purpose \* \* \* has for its objective the promotion of the general welfare of all the inhabitants or residents within a given political division, as, for example, a state, the sovereignty and sovereign powers of which are exercised to promote the public health, safety, morals, general welfare, security, prosperity, contentment, and equality before the law of all the citizens of the state."

The public nature of slum clearance projects having been recognized and passed upon by the legislature, as was their right, it is not now our duty or prerogative to interfere with that legislative finding in the absence of a clear showing that the determination of that body was wrong. Their findings, while not conclusive, are entitled to much weight. (*McNulty* v. *Owens*, supra; *Spahn* v. *Stewart*, supra; *New York City Housing Authority* v. *Muller*, supra.) All of the cases heretofore cited have upheld similar housing authority laws as being for a public purpose, and demonstrate very conclusively the reasons for such conclusions. We are in accord with that view.

Having decided that the use to which the housing projects will be devoted is a public one, it follows that the grant in the Housing Authorities Law of the right of eminent domain does not violate either Article III, section 14, or Article XV, section 9, of the state Constitution, assuming just compensation be made to owners. (*Dornan* v. *Philadelphia Housing Authority*, supra; *McNulty* v. *Owens*, supra; *Williamson* v. *Housing Authority of Augusta*, supra; *Marvin* v. *Housing Authority of Jacksonville*, supra; *Spahn* v. *Stewart*, supra; *New York City Housing Authority* v. *Muller*, supra; *State ex rel. Porterie* v. *Housing Authority of New Orleans*, supra.)

By virtue of these same authorities where the question was ▮ raised, the conclusion followed that the public nature of the use to which the housing property was devoted justified its exemption from state and local taxation. The same is true here. Peculiarly enough, the property and securities of an Authority are not expressly exempted from taxation in the Act itself, although such intention is announced in the title thereof. Whether this was inadvertently left out, or intentionally so, does not appear nor does it matter. Express exemption of housing properties and securities appears in the statute of many of the states, and a few, as ours, make no express provision. However, we believe the matter is of no consequence. Article XII, section 2, of the Constitution, expressly exempts from taxation the property of the United States, the state, county, cities, towns, school districts, municipal corporations and public libraries, because such property is public property. The property and securities of a Housing Authority are essentially public property and, therefore, within the constitutional exemption.

On this point it is said in *Dornan* v. *Philadelphia Housing Authority,* supra: ''In the absence of any statute to the contrary public property used for public purposes is exempt from taxation and from assessments for improvements, and no express exemption law is needed. * * * The general exemption * * * is * * * not only valid, but its statutory expression is unnecessary since it would have resulted from the public nature of the use of the housing projects.'' Further, as stated in *Cruse* v. *Fischl,* 55 Mont. 258, 175 Pac. 878, in speaking of Article XII, section 2: ''There cannot be a difference of opinion concerning the meaning of the language employed in section 2 above. The authority to tax any property of the first class is denied the lawmakers absolutely. The provision is mandatory in character, is self-executing and the legislation thereafter enacted declaring property of that class exempt added nothing to its force and effectiveness.'' (See, also, *Wells* v. *Housing Authority,* supra.)

There is no merit in the contention that the Act violates Article XIII of the Constitution, with respect to sections 1, 2, 4 or 6, concerning particular limitations with regard to the public indebtedness. Any possibility of contravention of these sections is foreclosed by the explicit language of the Act, wherein the following provision is made:

"Neither the commissioners of the Authority nor any person executing the bonds shall be liable personally on the bonds by reason of the issuance thereof.

"The bonds and other obligations of the Authority (and such bonds and obligations shall so state on their face) shall not be a debt of any city or municipality located within its boundaries or of the state and neither the state nor any such city or municipality shall be liable thereon, nor in any event shall they be payable out of any funds or properties other than those of the authority. The bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory provision of the laws of the state. Bonds may be issued under this Act notwithstanding any debt or other limitation prescribed by any statute." (Subd. (b), sec. 14, Chap. 140, Session Laws of 1935.)

The same contention was similarly dismissed in *Dornan* v. *Philadelphia Housing Authority*, supra, *State ex rel. Porterie* v. *Housing Authority of New Orleans*, supra, *Marvin* v. *Housing Authority of Jacksonville*, supra, *McNulty* v. *Owens*, supra, and *Williamson* v. *Housing Authority of Augusta*, supra.

As to the objection that the city cannot constitutionally loan its credit or make donations to the Housing Authority to cover the administrative expenses and overhead of the Authority the first year and from time to time make other donations, we are not impressed. We agree with what was said in *State ex rel. Porterie* v. *Housing Authority of New Orleans*, supra: "The primary purpose of housing authorities is to eradicate the slum menace. In doing so, they lighten the burden of cities in discharging the municipal duty of protecting all citizens indiscriminately against disease, crime and immorality. It is therefore perfectly clear that, when a city uses public

funds for the establishment of a housing authority, whether the funds be used for organization expenses or in the purchase of a small percentage of the housing authority's bonds, the city is performing, indirectly through a public agency created by the State and sanctioned by its own governing authority, one of the primary functions of municipal government.'' (Compare, also, *McNulty* v. *Owens,* supra, *Williamson* v. *Housing Authority of Augusta,* supra, *State ex rel. Cryderman* v. *Wienrich,* 54 Mont. 390, 170 Pac. 942, and *Stanley* v. *Jeffries,* 86 Mont. 114, 284 Pac. 134, 70 A. L. R. 166.)

The next contention urged by plaintiff is that the legislation ██ is in violation of Article V, section 26, Constitution, which prohibits special or class legislation. Persons of low income are singled out for special treatment. That this is a valid classification seems too clear for argument. The matter of classification is primarily for the legislature, which enjoys a broad discretion in selecting a particular class for special consideration. The presumption is that it acted upon legitimate grounds of distinction, if any such grounds existed. (See *State* v. *Safeway Stores, Inc.,* supra.) Identical classification has been upheld as valid in *State ex rel. Porterie* v. *Housing Authority of New Orleans,* supra, *Spahn* v. *Stewart,* supra, *Dornan* v. *Philadelphia Housing Authority,* supra, *Williamson* v. *Housing Authority of Augusta,* supra, and *New York City Housing Authority* v. *Muller,* supra.)

Some point is made of the fact that no criterion, definition or ██ specific standard is set up by the Act to guide a housing commission in uniformly determining with certainty just what persons will come within the term ''persons of low income.'' The vesting of this power of determination with the Housing Commission, contends plaintiff, constitutes a delegation of legislative powers in contravention of Article V, section 36, of our Constitution. A contrary position was taken in *State ex rel. Porterie* v. *Housing Authority of New Orleans,* supra, wherein the court said flatly: ''The right of a city to investigate and determine whether such conditions exist as warrant the organization of a housing authority and the right of the housing author-

ity to determine the question as to what persons are to be considered those of low income as prescribed in the Act, are not legislative functions.'' This conclusion was based on the rule laid down in *State* v. *Guidry,* 142 La. 422, 76 So. 843, wherein it was said: ''The authority of the legislature to delegate to the administrative boards and agencies of the state the power and authority of ascertaining and determining the facts upon which the laws are to be applied and enforced cannot be seriously disputed.'' (Compare *State ex rel. Stewart* v. *District Court,* 103 Mont. 487, 63 Pac. (2d) 141.) From this it also follows that the discretion vested in a Housing Commission to determine what is an unsanitary and unsafe building, and the discretion it must exercise in the performance and interpretation of the many other powers placed upon it by the legislature, may not be held vulnerable to the criticism that the provisions conferring such discretion carry a delegation of legislative power. (See, also, *Wells* v. *Housing Authority,* supra.)

We are of the opinion that this is not a fatal weakness in the legislation for the further reason that express provision is made for an authority ''to enter into such contracts, mortgages, trust indentures, leases or other agreements as the Federal Government may require including agreements that the Federal Government shall have the right to supervise and approve the construction, maintenance and operation of such housing project. It is the purpose and intent of this Act to authorize every authority to do any and all things necessary to secure the financial aid and the cooperation of the Federal Government in the construction, maintenance and operation of any housing project which the authority is empowered by this Act to undertake.'' (Sec. 23, Chap. 140; sec. 6, Chap. 138.)

It is pertinent to observe in this connection that section 424, Title 40, U. S. C. A., provides that, ''In the administration of any low-cost housing or slum-clearance project described in section 421 of this title, the Federal Emergency Administrator of Public Works shall fix the rentals.'' Section 1402, Title 42, Id., then provides certain definitions which must be considered in fixing the rents and selecting the tenants: ''(1) The term

'low-rent housing' means decent, safe, and sanitary dwellings within the financial reach of families of low income, and developed and administered to promote serviceability, efficiency, economy, and stability, and embraces all necessary appurtenances thereto. The dwellings in low-rent housing as defined in this chapter shall be available solely for families whose net income at the time of admission does not exceed five times the rental (including the value or cost to them of heat, light, water, and cooking fuel) of the dwellings to be furnished such families, except that in the case of families with three or more minor dependents, such ratio shall not exceed six to one. (2) The term 'families of low income' means families who are in the lowest income group and who cannot afford to pay enough to cause private enterprise in their locality or metropolitan area to build an adequate supply of decent, safe, and sanitary dwellings for their use." Many of the states have followed the 5 to 1 ratio as a criterion for tenant selection, and some have even more stringent requirements.

Section 1415, Title 42, U. S. C. A., also embraces certain provisions for the purpose of insuring that the low-rent character of housing projects will be preserved, which in substance are that in the loan agreements entered into between the United States Housing Authority and a State Housing Authority, the former may insert any covenant, condition or provision it may deem necessary to insure the low-rent character of a given housing project.

It is significant that the housing authorities generally will be financed with funds chiefly supplied by the Federal Government. In fact the national Housing Program is the forerunner and motivating force behind all the state Acts which have been passed, including our own, in order that proper machinery might be set up to enable cities and towns to take advantage of the federal program. It is part and parcel of the federal program of public works. (Sec. 402, Title 40, U. S. C. A.) In the instant case, the complaint alleges that 90 per cent. of the funds sought for Great Falls will, under contract with the Great Falls Housing Authority, be loaned by the United States, and

that the United States Housing Authority will under agreement make further fixed annual contributions under certain conditions.

With all the restrictions and limitations placed upon the administration of the Federal Housing Authority, there would seem to be little doubt but what the term ''persons of low income'' will be uniformly determined throughout the various cities of the state according to the rental requirements set up by the Federal Act. At least such a presumption seems the only reasonable one where it is so obvious that the spirit of our law is intended so plainly to dovetail into the Federal Housing Act. (Compare *State ex rel. Wilson* v. *State Board of Education*, 102 Mont. 165, 56 Pac. (2d) 1079.) If, after the state Act goes into operation, some individual is unjustly discriminated against, he may at that time be heard to complain and in turn rebut the presumption we are willing to indulge here. It must be remembered, as before noted, that the various authorities throughout the state will do ''any and all things necessary to aid and cooperate in the planning, construction and operation of housing projects by the United States of America and by housing authorities.''

Finally it is urged that the contract of cooperation entered ▉ into between the city and the Housing Authority is invalid and void. The gist of the contract is that the city agrees to eliminate unsafe and unsanitary dwellings in the city to an extent at least equal to the number of new dwelling units to be erected by the Housing Authority, and to cooperate generally in the program of low-cost housing or slum clearance.

This same question was raised in *McNulty* v. *Owens*, supra, 199 S. E. 430, and the court there disposed of the contention in these words: ''The proposed contract between the City of Columbia and the Columbia Housing Authority whereby the City will bind itself to demolish unsound and insanitary dwellings equal in number to the number of dwellings constructed by the Authority less the number of unsafe and insanitary units demolished by the Authority constitutes merely an agreement on the part of the City to exercise a power which it

already has in such a manner as to cooperate with the program of the Housing Authority. Any action taken by the City in fulfilment of this contract will be subject to all of the limitations to which such actions are subjected under the Constitution and laws of the State; and this contract neither increases or decreases the protection afforded to citizens by those limitations. The contract does not constitute an attempt by the City to bind itself in its exercise of governmental functions. It is merely an agreement to cooperate in the use of those functions and as such is valid.'' To like effect, see *Marvin* v. *Housing Authority of Jacksonville*, supra.

Counsel for plaintiff in his brief makes no attempt to criticize, distinguish or nullify the effect of the many Housing Authority decisions (with the exception of one) cited by defendants and to which we here attach controlling significance. Instead, he urges that we adopt and follow the reasoning of the case of *Opinion of the Justices*, 211 Mass. 624, 98 N. E. 611, 42 L. R. A. (n. s.) 221, decided in 1912. The statute there under consideration involved no provision for the clearance of slum areas, and possibly the unemployment problem was not as acute then as now. That case was relied upon by plaintiff in *Dornan* v. *Philadelphia Housing Authority*, supra, but was not followed by the court. We, likewise, are not disposed to follow the rule applied in that case. The scope and purpose of the present legislation contemplate the remedying of many evils. A large majority of the states have indicated their desire for this type of program, and the courts in which the respective Acts have been attacked have not faltered for an answer in upholding them. We prefer to follow the precedents laid down in those late and analogous cases.

The demurrer is sustained and the proceeding dismissed.

MR. CHIEF JUSTICE JOHNSON, ASSOCIATE JUSTICES ANGSTMAN and ERICKSON, and HONORABLE C. B. ELWELL, District Judge, sitting in place of MR. JUSTICE MORRIS, absent on account of illness, concur.