STATE ex rel. HELENA HOUSING AUTHORITY, Relator, *v.* CITY COUNCIL OF CITY OF HELENA et al., Respondents.

(No. 7,973.)

(Submitted May 3, 1939. Decided May 10, 1939.)

[90 Pac. (2d) 514.]

Mr. *Lester Loble* and Mr. *C. N. Davidson,* for Relator, submitted a brief, and argued the cause orally.

Mr. *John Mahan,* for Respondents, submitted a brief, and argued the cause orally.

Mr. *Paul Keller, Amicus Curiae,* submitted a brief, and argued the cause orally.

Mr. *T. J. Collins,* appearing in behalf of the Helena Trades & Labor Council, argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court. ·

This is an original proceeding for a writ of mandamus. The question involved is whether the Helena Housing Authority can compel the respondents to appropriate money to the Authority to pay the preliminary expenses of the Authority for the first year following its incorporation. The facts out of which the controversy arises are these:

The city of Helena, through the city council, acting in accordance with sections 5309.1 et seq. of the Revised Codes, and after a petition signed by the requisite number of signers was presented to it, called a meeting for the purpose of considering the petition, and noticed it for hearing on the 15th day of June, 1938. After hearing evidence for and against the creation of the Authority, the city council adopted a resolution determining that unsafe and insanitary inhabited dwelling accommodations exist in the city of Helena, and that there is a lack of safe and sanitary dwelling accommodations in the city and surrounding area, necessitating the creation of the Authority. The mayor then appointed commissioners of the Authority, and on October 1, 1938, the Secretary of State issued to the commissioners a certificate to the effect that the Helena Housing Authority was a duly incorporated public body. The Authority then, acting in cooperation with the city, made application to the federal government for a grant of money for the housing project. Three hundred thousand dollars were set aside and earmarked by the federal government for the project in Helena pending the making and approval of an application for the allotment by relator.

The Authority employed certain persons and firms to facilitate the preliminary work necessary to make formal application for the money to the federal government. The respondents, representing the city of Helena, entered into a written cooperative agreement with the Authority, the contents of which need not here be recited except to say that the city agreed to eliminate unsafe and insanitary dwelling units of a number equal to the number of new low-rent units to be provided by the Authority. On February 13, 1939, the Authority by resolution asked the city to estimate the amount of money necessary for the preliminary expenses, and to pay such amount to the Authority. This the city has refused to do, and the Authority seeks by this proceeding to compel it to do so.

The Authority contends that by virtue of section 5309.31 it is mandatory on the part of the city to comply with its request. This section is as follows: "Immediately after the in-

corporation of the housing authority, the council or other governing body of the city included within the territorial boundaries of such authority shall make an estimate of the amount of money necessary for the administrative expenses and overhead of the housing authority during the first year following the incorporation of such housing authority, and shall appropriate such amount to the authority out of any moneys in the city treasury not appropriated to some other purposes, and shall cause the moneys so appropriated to be paid the authority as a donation. In addition thereto, the city and any municipality located in whole or in part within the boundaries of a housing authority shall have the power annually and from time to time to make donations or advances to the authority of such sums as the city or municipality in its discretion may determine. The authority, when it has money available therefor, shall reimburse the city or municipality for all advances by way of loan made to it.''

The city based its refusal to make the appropriation upon ▮ the ground that ''the city has no funds appropriated for that purpose, and no funds not otherwise appropriated.'' The city takes the position that its duty to make an appropriation is limited by the phrase found in section 5309.31, ''out of any moneys in the city treasury not appropriated to some other purposes.'' It contends that, if it has no unappropriated moneys in its treasury, it has no duty under that section.

Relator, on the other hand, takes the view that the quoted phrase is simply descriptive of the appropriation which the city is bound to make, i. e., as is customary with appropriations generally, it too must be made of moneys not otherwise appropriated. Relator's contention in this respect must be upheld. The city normally never has any money in its treasury not appropriated, because funds raised by the city are provided in accordance with a budget, including the estimated expenditures and a levy made sufficient to cover them. (Secs. 5083.1 et seq., Rev. Codes.) We cannot believe that it was the intention of the legislature to pass the Act—sections 5309.1 to 5309.36—to meet an emergency, and then to make its operation

depend upon whether the city had surplus funds not otherwise appropriated, particularly where, as here, the city itself determined the necessity for the creation of the Authority and exercised its discretion with relation thereto.

Section 5083.8, Revised Codes, in part provides: "Upon the happening of any emergency caused by fire, flood, explosion, storm, earthquake, epidemic, riot or insurrection, or for the immediate preservation of order or of public health, or for the restoration of a condition of usefulness of any public property the usefulness of which has been destroyed by accident, or for the relief of a stricken community overtaken by calamity, or in settlement of approved claims for personal injuries or property damages, exclusive of claims arising from the operation of any public utility owned by the municipality, or to meet mandatory expenditures required by law, the council may, upon adoption by unanimous vote of all members present at any meeting, the time and place of which all members shall have had reasonable notice, of a resolution stating the facts constituting the emergency and entering the same upon their minutes, make the expenditures or incur the liabilities necessary to meet such emergency without further notice or hearing."

Moneys required to be expended under section 5309.31, constitute "mandatory expenditures required by law" within the meaning of section 5083.8. The discretion which the council has under section 5083.8 relates to the matter of declaring an emergency and does not give the city discretion in meeting mandatory expenditures required by law. When the city created the Authority it exercised its discretion on the matter of an emergency, and there is no occasion to again declare an emergency under section 5083.8. When the city created the Authority there then arose the obligation to make an appropriation, and there came into being, by operation of law, the duty to make the expenditure contemplated by section 5309.31. It ▮ is immaterial whether there was a unanimous vote declaring an emergency necessitating the creation of the Authority, because a unanimous vote on that question is unnecessary under the law. Section 5309.4 being later in point of time than sec-

tion 5083.8, the former controls as to the character of the vote required to declare an emergency under it.

The principal contention on the part of the city and by counsel appearing as *amici curiae,* is that the legislature has not the power to compel it to spend money for the purpose here sought. They rely upon section 4, Article XII of the Montana Constitution, reading: "The legislative assembly shall *not levy taxes* upon the inhabitants or property in any county, city, town, or municipal corporation for county, town, or municipal purposes, but it may by law invest in the corporate authorities thereof powers to assess and collect taxes for such purposes." They contend that the functions of the Helena Housing Authority are purely of local concern, affecting the residents of Helena only, and that if the city cooperates with the Authority in carrying out its functions it is acting in its proprietary capacity in carrying out a municipal function, and is not acting in a governmental capacity.

The difference between proprietary and governmental functions of a municipal corporation was pointed out in *State ex rel. Gebhardt* v. *City Council,* 102 Mont. 27, 55 Pac. (2d) 671, 675. In that case this court said: "So far as municipal corporations of any class are concerned, whether incorporated pursuant to special or general law, when they exercise any power for purposes essentially public—purposes pertaining to the administration of general laws made to enforce the general policy of the state—they are deemed agencies of the state. When a municipality performs an act in compliance with the legislative mandate of the state, it exercises a governmental and not a corporate function. * * * In exercising or enforcing any police power the city acts in its capacity as the agent of the state and is subject to absolute state control; in exercising proprietary powers under the home-rule or local self-government theory, the municipality has the same right of independent action that is accorded to private corporations, and, in addition, has such other powers as are reserved to them by the Constitution. For example, it is a duty imposed on the city in its governmental capacity to provide an adequate water supply for city use,

but if the city itself undertakes to furnish such water supply by installing a city-owned plant and distributing system, it exercises a proprietary function and is not accountable to the state nor amenable to legislative control to any greater extent than a private corporation. Taking another view of the controversy involved here, it is universally conceded that 'the source of the police power of a municipal corporation is the state, * * * and the exercise of police powers of municipal corporations is a governmental function.' "

That the legislation in question here is for a public, rather than a private, purpose, and passed in the exercise of the police power of the state, we have already held in *Rutherford* v. *City of Great Falls,* 107 Mont. 512, 86 Pac. (2d) 656, 658, where we said:

"In enacting the law the legislature made certain findings of fact upon the basis of which it determined and declared the necessity in the public interest of the provisions enacted, and that the objects thereof were 'public uses and purposes for which public money may be spent and private property acquired.' (Sec. 1, Chap. 138; sec. 2, Chap. 140.) It is obvious that the law was passed in the exercise of the sovereign police powers inherent in state governments. (*State* v. *Safeway Stores, Inc.,* 106 Mont. 182, 76 Pac. (2d) 81.) It is equally clear from a reading of the findings and declarations of necessity set out in both Acts that the legislature considered that it was enacting laws involving a public purpose. Legislation having for its purpose the eradication of slums and the substitution in place thereof of safe and sanitary dwellings is well within the definition of 'public purpose' as defined in *Green* v. *Frazier,* 44 N. D. 395, 176 N. W. 11, affirmed by the United States Supreme Court in 253 U. S. 233, 40 Sup. Ct. 499, 64 L. Ed. 878, as follows * * * : 'A public purpose * * * has for its objective the promotion of the general welfare of all the inhabitants or residents within a given political division, as, for example, a state, the sovereignty and sovereign powers of which are exercised to promote the public health, safety,

morals, general welfare, security, prosperity, contentment, and equality before the law of all the citizens of the state.'

"The public nature of slum clearance projects having been recognized and passed upon by the legislature, as was their right, it is not now our duty or prerogative to interfere with that legislative finding in the absence of a clear showing that the determination of that body was wrong. Their findings, while not conclusive, are entitled to much weight. (*McNulty* v. *Owens*, supra [188 S. C. 377, 199 S. E. 425]; *Spahn* v. *Stewart*, supra [268 Ky. 97, 103 S. W. (2d) 651]; *New York City Housing Authority* v. *Muller*, supra [270 N. Y. 333, 1 N. E. (2d) 153, 105 A. L. R. 905].) All of the cases heretofore cited have upheld similar housing authority laws as being for a public purpose, and demonstrate very conclusively the reasons for such conclusions. We are in accord with that view."

Holding, as we must, that the matter of carrying out the plan contemplated by sections 5309.1 to 5309.36, supra, constitutes a public or governmental function, rather than a proprietary or private one, the state's right to compel cities to make expenditures therefor cannot be denied. (*State ex rel. Gebhardt* v. *City Council*, supra.) It is this difference that distinguishes the case from that of *State ex rel. City of Missoula* v. *Holmes*, 100 Mont. 256, 47 Pac. (2d) 624, 100 A. L. R. 581, and *State ex rel. Kern* v. *Arnold*, 100 Mont. 346, 49 Pac. (2d) 976, 100 A. L. R. 1071.) This conclusion is especially true where the city is given the right in the first instance to pass upon the question of the existence or nonexistence of the necessity for the housing project, and has found that such necessity exists and has, by its own affirmative act, created the Authority. Under such circumstances it must follow that the city has given its consent to assume the burdens of the Act as well as to receive benefits therefrom. The case is, therefore, distinguishable from that of *State ex rel. Gerry* v. *Edwards*, 42 Mont. 135, 111 Pac. 734, Ann. Cas. 1912A, 1063, 32 L. R. A. (n. s.) 1078.

That city funds may constitutionally be donated to the Authority we have already held in the case of *Rutherford* v. *City of Great Falls*, supra, where we said: "As to the objection that

the city cannot constitutionally loan its credit or make donations to the Housing Authority to cover the administrative expenses and overhead of the authority the first year and from time to time make other donations, we are not impressed. We agree with what was said in *State ex rel. Porterie* v. *Housing Authority,* supra [190 La. 710], 182 So. [725] 733: "The primary purpose of housing authorities is to eradicate the slum menace. In doing so, they lighten the burden of cities in discharging the municipal duty of protecting all citizens indiscriminately against disease, crime and immorality. It is therefore perfectly clear that, when a city uses public funds for the establishment of a housing authority, whether the funds be used for organization expenses or in the purchase of a small percentage of the housing authority's bonds, the city is performing, indirectly through a public agency created by the State and sanctioned by its own governing authority, one of the primary functions of municipal government."

The Act itself defines the Authority as "a public body and a body corporate and politic organized in accordance with the provisions of this Act for the purposes, with the powers and subject to the restrictions hereinafter set forth." (Sec. 5309.3.) The terms of the Act, while providing that the Authority is created after the city determines the necessity, yet the specification of its powers and limitation indicates that the Authority owes allegiance only to the statutes enacted by the legislature. By the statutes it is provided that this Authority, once created, is a separate and definite legal entity, and by the method adopted for its creation derives its spark of life from the city and its powers from the legislative will.

The language of section 5309.31 is mandatory in its terms, and when the Authority is created the city *shall* make an estimate of the amount of money necessary for the first year's expense and shall appropriate the same to the Authority. It is the plain legal duty of the city, now that the Authority has been created by consent of the city, to make an estimate as provided in section 5309.31, Revised Codes, and make the appropriation. When the estimate has been made, the claim against the city has been

liquidated and the Authority has the clear right to the amount so estimated.

The statute gives the city discretion in making this estimate, and we do not attempt to control this discretion in the absence of a clearly arbitrary abuse. We determine that the sum to be paid shall be that amount the city estimates to be reasonably necessary.

The court finds and determines that the respondent officers of the city of Helena appeared and made defense in this proceeding in good faith. By virtue of section 9858, Revised Codes, relator is entitled to recover costs of this proceeding, including a reasonable attorney's fee, which shall be a proper claim against the city of Helena.

Let the writ issue as prayed for.

Mr. Chief Justice Johnson and Associate Justices Morris, Stewart and Erickson concur.