GOVERNMENT OF THE CAPITAL, Plaintiff and Appellee, v. Executive Council of Puerto Rico, etc., et al., Defendants and Appellees.

No. 8703. Argued February 1, 1944.—Decided April 20, 1944.

418

*M. Rodríguez Ramos, Acting Attorney General,* for the Governor, the Executive Council, and the Water Resources of Puerto Rico. *James E. Curry, Alberto Picó Santiago, Conrad J. Shearer,* and *Raúl Trujillo Santiago, of counsel,* for the Water Resources Authority of Puerto Rico. *F. Fernández Cuyar* and *H. González Blanes* for appellee.

MR. JUSTICE SNYDER delivered the opinion of the court.

This case presents a single question. Is a statute authorizing the transfer without compensation of the aqueduct of a municipality to an insular agency valid? The district court in a suit for a declaratory judgment brought by the Government of the Capital against the members of the Executive Council and the Water Resources Authority held that the Act in question was unconstitutional on the ground that it deprives the municipality of its property without just compensation. The case is here on appeal from that judgment.

We do not pause to examine the argument of appellants that "the fullest and most effective uses of the water resources of the island for such purposes as to generation of electric power, irrigation, and public water supply can best be obtained by a unified and coordinated approach to the problem". The municipality does not dispute this proposition. It concedes the power of the Insular Government to assume the ownership and operation of the aqueduct. The municipality pitches its case on the requirement of the Organic Act for just compensation for *private* property taken for *public* use.

We likewise put to one side the provisions of the Act[1] that the transfer of a municipal aqueduct to the Water Resources Authority pursuant thereto is not automatic and cannot take place until findings are made that the quality, quantity, and regularity of the water being supplied to the inhabitants of the municipality do not meet the required standards, and that such findings can be made only after hearing and are subject to judicial review. Whatever safeguards the Act may have erected against arbitrary action by insular authorities, the fact remains that the compensation to the municipality provided for in the Act in the event of such a transfer falls short of the just compensation required by §2, paragraph 9 of the Organic Act.[2]

Again the parties are not in dispute. The appellants admit that Act No. 39 does not provide for such compensation. They rest their case on the contention that the district court erred in holding that this constitutional provision applies as between a municipal and its creator, the insular government; rather, they assert that, under the conditions and safeguards set forth in Act No. 39 as amended, an aque-

---

[1] Act No. 39, Laws of Puerto Rico, 1941, Special Session, as amended by Act No. 29, Laws of Puerto Rico, 1942.

[2] "Private property shall not be taken . . . . for public use except upon payment of just compensation . . . ." (48 U.S.C.A. §737).

duct belonging to a municipality may be transferred to an insular agency without compensating the municipality therefor. This case rises or falls on the validity of that proposition.

I

 The theory of The Capital in this case is rooted in the distinction found in the cases between (1) property owned and used by a municipality in its public, governmental, or sovereign capacity, and (2) property owned and used by a municipality in its private or proprietary capacity. The Capital makes no claim that the state must compensate a municipality if it transfers property held by a municipality in its governmental capacity. But it does maintain that the state cannot take over property held by a municipality in its proprietary capacity unless just compensation is made. And its position here is that The Capital owns its aqueduct in its proprietary capacity; and that, consequently, Act No. 39, which authorizes the transfer of the aqueduct of The Capital to the Water Resources Authority without just compensation, is in conflict with §2, paragraph 9, of the Organic Act and is therefore void.

It therefore becomes imperative for us to scrutinize the distinction between the governmental and the proprietary operations of municipalities. We begin by pointing out that this distinction, a least in the common law, is judge-made law, and that it finds its most frequent expression in the field of torts. Its purpose there is obvious. The sovereign, unless consent is granted, is immune from suit, and this immunity is inherited by a municipality as an agent of the state. Employees of municipalities, when carrying out municipal functions, are sometimes negligent, to the injury of private individuals. Therefore, to escape the doctrine of immunity, the courts have in the past evolved, in the field of tort law, a distinction between governmental and private

activities of municipalities. Municipalities were held liable for all torts committed by their agents in the performance of private or proprietary functions.

The distinction, although thoroughly imbedded in the law, is difficult to state. There is no pattern into which each function fits. The most that can be said is that the courts of each jurisdiction, guided by their own nations of public policy, have, by the case method of inclusion and exclusion, gradually built up a body of precedents on the subject. Some courts, however, have come increasingly to feel that the fine-spun distinctions which are thus drawn are both illogical and unjust. This court shares those misgivings. In our most recent expression on the subject, we pointed to the anomaly of holding a municipality liable for the negligence of the driver of a vehicle of the municipal waterworks, but exempting it from liability if the same driver operated a municipal fire truck (*Davidson* v. *H. I. Hettinger & Co.*, 62 P.R.R. 286). In that case we asserted that (p. 296) "Borchard ... argues, correctly, we think, that no reason is readily apparent for holding that public or governmental functions cannot be duly exercised unless the municipality is immune from liability for the negligence of its officers ... it would at least respond more satisfactorily to a public sense of justice if losses inflicted on the individual by the wrongful acts of agents of the community are spread over the community as a whole rather than allowed to rest upon the unfortunate victim alone". We therefore proceeded to hold in the *Davidson* case that, although the maintenance of its streets and highways was performed by a municipality in its governmental capacity, the municipality was nevertheless liable for acts of negligence of its employees when engaged in such functions.

We thus see that this court, and other courts, when confronted with the facts of modern life, have refused to cling to outmoded concepts of law which were created by the courts of an earlier day as a rule of convenience to fit the condi-

tions then prevailing.[3] It would be idle to attempt to conceal the fact that we have gone to the very brink of abolition of the doctrine that governmental activity immunizes municipalities from tort liability. To concede that maintaining sidewalks is a governmental and not private function, and then to assert that in this particular case we shall carve out an exception to the rule of immunity from tort liability for governmental activity, is to open the door to other exceptions in other appropriate cases. Some jurisdictions have, we think wisely, enacted sweeping statutes abandoning the inmunity of municipalities and other governmental agencies from tort liability; and the Federal government is presently considering a similar step. The distinction between governmental and private activity by a municipality has, in brief, been emptied of much of its content in the field of tort law.

Turning to the particular question before us, we do not undertake to determine whether the distinction between the proprietary and governmental functions of a municipality originated in the field of tort or of property law. We suspect that it had its genesis in a tort case, at least in the common law. Certainly the rationale behind it, although fast fading under the impact of modern life and the increasing scope of governmental activities, is more evident in a tort case. In any event, the question of whether the distinction exists in the property field, at least with the effect attributed to it by the appellee, is novel in this jurisdiction. And its importance in this case is manifest: the municipality contends it holds title to the aqueduct in its proprietary capacity; it asserts that the Insular Government can transfer title thereto only by virtue of a condemnation proceeding in which The Capital would receive just compensation therefor; and it places a value thereon of $7,000,000.

---

[3] Cf. *Carrasquillo v. Am. Missionary Ass'n.*, 61 P.R.R. 837, where we pointed out that even charitable corporations can no longer confidently continue in all cases to expect immunity from tort liability for the negligence of its employees.

Counsel for both parties have made a prodigious effort to marshal the cases and texts which support their respective theories. Counsel for appellants in particular have gone to great lengths to examine the facts and holding of each case cited by the appellee in an effort to cast doubt on their authority herein. We see no purpose in retracing those steps of counsel. It is enough to say that, valiant as the effort of appellants to explain away the cases has been, it cannot be gainsaid that the majority of the state courts which have considered the question, as a matter of common law, whether in *dicta* or decision, have, even in the field of property law, drawn a distinction between property held by a municipality in its governmental as against its proprietary capacity, and have held fast to the doctrine that municipalities cannot be deprived by the state of property held by them in their proprietary capacity without just compensation.[4] Appellants contend that without exception these state cases stem from early *dicta* of the Supreme Court of the United States which were repudiated by the Supreme Court itself in *Trenton* v. *New Jersey,* 262 U. S. 182, which is hereinafter discussed in detail. Whether those state courts will change their views, as appellants contend, when *Trenton* v. *New Jersey* is forcibly called to their attention, is for

---

[4] *The People* v. *Hulrbut,* 24 Mich. 44, 9 Am. Rep. 103 (1871); *Board of Park Commissioners* v. *Common Council of Detroit,* 28 Mich. 227, 15 Am. Rep. 202 (1871); *Proprietors of Mt. Hope Cemetery* v. *City of Boston,* 33 N.E. 695 (Mass., 1893) (Adversely criticized in 36 Harv. L. Rev. 465. It is difficult to reconcile the vote of Holmes in favor of this holding with his concurrence in *Trenton* v. *New Jersey,* 262 U.S. 182); *State* v. *Barker,* 89 N. W. 204 (Iowa, 1902); *City of Lexington* v. *Thompson,* 68 S.W. 477 (Ky., 1902); *State* v. *Fox,* 63 N.E. 19 (Ind., 1902); *Shirk* v. *City of Lancaster,* 169 A. 557 (Pa., 1933), with which compare *Lighton* v. *Abington Tp.,* 9 A. (2d) 609 (Pa., 1939); *State* v. *Holmes,* 47 P. (2d) 624 (Mont., 1935), but compare *State* v. *City Council of City of Helena,* 90 P. (2d) 514 (Mont., 1939), where public housing was held to be governmental; *Chadwick* v. *City of Crawfordsville,* 24 N.E. (2d) 937 (Ind., 1940); *Benwood-McMechen Water Co.* v. *City of Wheeling,* 4 S.E. (2d) 300 (W. Va., 1939); *Town of Winchester* v. *Cox,* 26 A. (2d) 592 (Conn., 1942).

them to decide. We confine ourselves to determining if we wish to adopt in this jurisdiction the rule these cases concededly lay down.

However, we do feel it appropriate to point out, before leaving the question of the rule in other jurisdictions, that many of those holdings, either expressly or by implication, are predicated on home rule provisions for municipalities found in various state constitutions. Such a provision does not, of course, exist in our Organic Act. On the contrary, the municipalities of Puerto Rico are mere subdivisions of the Insular Government, completely subject to its will (*People ex rel. Castro* v. *Padrón,* 60 P.R.R. 777). Indeed, the Organic Act gives the legislature "power to create, consolidate, and reorganize the municipalities . . . and to . . . repeal laws and ordinances therefor . . . .". (48 U.S.C.A. §821). These home rule cases therefore have no validity whatsoever in this jurisdiction.

In addition, even in some states where no constitutional provision for home rule is found, the overtones of that principle have affected the development of the law on this subject. The courts are as aware as others of the battle which has raged on local and national fronts between the theories of centralization and descentralization in government. It has perhaps been human for the courts to let their views on that question subconsciously influence the results reached in litigation before them. But the question involved is political, not judicial. Congress has ordained that the municipalities of Puerto Rico shall not have home rule. This court has no right, by indirection or otherwise, to confer it upon them.

In discussing the case law on this subject, counsel for appellants assert that many state courts fell into error by accepting without analysis the *dicta* of strong-minded judges of an earlier generation like Storey and Cooley. We agree with them, if we are free to exercise our independent judgment in the premises, that such blind adherence to prece-

dents of other jurisdictions should not be our course.[5] We therefore address ourselves to the problem of determining whether the theory of the appellee and the district court can be justified on principle and reason.[6]

The first step in any debate founded on logic is to attempt to define the terms of the proposition being debated. But, as we have already seen in our examination of this proposition as expounded in the field of tort law, no precise dividing line has ever been pricked out between the private and governmental functions of a municipality.[7] It is difficult to resist the conclusion that the distinction in that field was wholly artificial. It was concededly a legal fiction. However lacking logic it may have been, it served the useful purpose of imposing liability on municipalities for the torts of its agents. But when we undertake to examine the operations of a municipality apart from the compelling exigencies of tort law, it is difficult to grasp the concept that there is a radical difference, for example, between putting out fires and supplying the water for putting out fires. We have no quarrel with the decisions, including our own, which have seized on such a distinction as a rule of convenience to serve the ends of justice in a tort case (*Colón* v. *Capital of Puerto*

---

[5] The district judge wrote a careful and able opinion which has been exceedingly helpful to this court. He indicated in effect that he felt constrained to follow the great weight of authority in the state courts. This point of view of the judge, sitting as a district court, is understandable and we do not criticize him for it. But as it is our duty as the highest court of this jurisdiction to establish the local law on this novel question, we cannot be bound by authorities from other state courts on a question of this magnitude unless we are convinced of the soundness of their reasoning.

[6] "Now an objection which men will not examine and debate is a prejudice." Walter Lippman, United States Foreign Policy, p. 43.

[7] Mr. Justice Jackson, in concluding that the term public utility included warehouses in certain states under the Federal Emergency Price Control Act, said, speaking for the Supreme Court, in *Davies Warehouse Co.* v. *Bowles*, 321 U.S. 144, decided January 31, 1944: "Use of that term in a context of generality wears an appearance of precision which proves illusory when exact application becomes necessary. Relevant authorities and considerations are numerous and equivocal, and different plausible definitions result from a mere shift of emphasis."

*Rico*, 57 P.R.R. 15). But we have been unable to discover the convenience or justice involved in transplanting this dying doctrine to the foreign soil of property law. We cannot blink the fact that a municipality under our Organic Act is a mere subdivision or agent of the state (*People ex rel. Castro v. Padrón, supra,* at p. 786) and that its ordinance can be repealed by the legislature (48 U.S.C.A. §821).[8] How can it therefore be heard to say that it has a vested right to continue to own and to operate its aqueduct, of which the Legislature cannot deprive it without compensation therefor?

The contention of the appellee requires that we accept uncritically the dogmatic assertion that there are two rigid categories of property belonging to municipalites, and that an aqueduct falls into the private or proprietary, and not the governmental or public, category. But we cannot repeat too frequently our conviction that this is a distinction of convenience which owes its existence, in the common law at least, primarily to the exigencies of tort law. When we examine the matter free from the inhibitions of the definitions created to serve the purposes of tort law, we are immediately led to inquire—how can a body organized for governmental purposes hold title to property and operate the same except for governmental purposes? It would be incomprehensible to a layman, for example, to be told that *government* agencies engage in *private* activities. Such a legal fiction should exist only if it serves a useful purpose. Here we can find none.

---

[8] We are aware that in *Colón v. Capital of Puerto Rico*, 57 P.R.R. 15, this court, in speaking of the aqueduct of the Capital, said at page 18: ''The municipality is not bound by any law to supply water to its inhabitants. When it does so the municipality acts on its own initiative, for a price, and for its own benefit. *It does not act on behalf or as an agent of the state.* It acts in its capacity as a corporation or artificial person.'' (Italics ours). We do not repudiate that language, as applied to the facts of that case. We note only that it can not be applied generally, but must be read in the light of the facts of the *Colón* case. There the formula of a private, non-governmental activity of a municipality was used to attain the just result of liability of the municipality in tort. The quoted language therefore applies only to the facts of that case, and cannot be extended to apply generally or to specific case where, as in the instant case, it is inappropriate.

The short of it is that many courts have become wound up in the red tape of this artificial distinction because of their refusal to recognize the difference between its application in the field of torts and in property law. We prefer to extricate ourselves from that dilemma by holding that the distinction serves no useful purpose in the question before us. We therefore conclude that it is immaterial for the purposes of this case whether we say that the Government of the Capital holds title to the municipal waterworks in its private or in its governmental capacity. What is important is that the property is owned and operated by an agent of the state, and that the state as principal can change the operating trustee thereof.

We use the term "operating trustee" advisedly. It is important to note that the Act before us does not empower an insular agency to dismantle a municipal aqueduct and to sell it or to use it elsewhere. The Act carefully guards against any such conduct. It provides that each aqueduct taken under this Act shall continue to be operated as at present for the use and benefit of the inhabitants of the community it is now serving. This would in effect be merely a change of administration for the aqueduct involved. The appellants understand that the Act did not and could not go any further.[9]

We are not disturbed by the challenge that we are calling public what some courts have in the past called private. "Nor is the concept of the general welfare static. Needs that were narrow or parochial a century ago may be inter-

---

[9] In their reply brief appellants make the following statement: "Appellants do not here contend for the right of the Government of Puerto Rico to take the San Juan waterworks, dismantle it and ship it to Mayagüez or Ponce for the use of the citizens of those communities. The Aqueduct Law effectively provides that it shall continue to be used for the same purpose as before and for the benefit of the same community. Even if the law did not so provide, the property would probably be impressed with a trust for the purposes for which it was acquired, as pointed out in the case of *Kelly* v. *Brunswick*, 187 Atl. 703 (1936), cited by the appellees themselves."

woven in our day with the well-being of the Nation. What is critical or urgent changes with the times." (Mr. Justice Cardozo in *Helvering* v. *Davis*, 301 U. S. 619, 641). It is trite to say that government has expanded its functions in recent years. Many matters which were once thought to be outside the scope of governmental operations, such as relief and housing, are now accepted as part of the local and national governmental scene. Indeed, some of the courts which have held that only property held by a municipality in its governmental capacity could be transferred to a state agency without compensation have later found themselves driven to hold that such things as transportation and housing, which were thought of for generations as purely private, were governmental activity, in order to permit intervention of the state in the affairs thereof.[10]

Governments now regulate businesses as "affected with a public interest" which have traditionally been private (*People* v. *A. Roig Sucrs.*, decided February 1 1944, *ante*, p. 17). Are we to say that water supply is not so vital to a community as and is less "affected with a public interest" than the grinding of sugar cane?[11] We need hardly add that we are cognizant of the difference between the regulation of the grinding of sugar cane and the taking of property without compensation. But the interests of private individuals engaged in a private enterprise for profit are not involved in the case before us. The property herein is owned by a governmental agency, whether we label it private or governmental property. The said governmental agency is a subdivision of its principal, and is acting for the benefit of the

---

[10] Massachusetts cases discussed in 36 Harv. L. Rev. 456; *State* v. *City Council of City of Helena*, 90 P. (2d) 514 (Mont., 1939); *Simon* v. *Northup*, 40 Pac. 560 (Ore., 1895).

[11] For excellent statements of the high public purpose involved in furnishing water to its inhabitants by a municipality, see *David* v. *Portland Water Committee*, 14 Ore. 98, (1886); *State* v. *Walmsley*, 162 So. 826, 842-3 (La., 1935); *Brush* v. *Commissioner*, 300 U.S. 352.

inhabitants of the municipality as a whole. Under such circumstances, to seize on the label "proprietary capacity" to justify a vested right of ownership of private property of a public agent as against its principal, the state, is to reason in a vacuum.

The upshot of the matter is that, although the furnishing of water to the community might, as in other jurisdictions, have been left in private hands,[12] if The Capital, acting within the scope of the authority vested in it by the legislature, does engage in this activity, it is engaging in a legitimate activity as a governmental body. To hold otherwise in a case of this type would be to grant home rule to the municipalities of Puerto Rico. Congress has seen fit not to provide for it. We are not at liberty to read it into the Organic Act.

Another facet of this problem deserves attention. The district court took the position that the operation of an aqueduct is performed by a municipality in its proprietary capacity, "except in those cases in which the Legislature has imposed the obligation of operating an aqueduct". But this again is a test which has no relation to the practical problem involved. To base a judgment as portentous and far-reaching as that involved in the instant case on the purely fortuitous circumstance that the state authorizes[13] rather than commands a municipality to own and operate a waterworks in itself demonstrates that this theory has been worn threadbare.

The municipality, a subdivision, creature and agent of the state, demands $7,000,000 for the transfer by the state of its aqueduct to another agency of the state which will

---

[12] We note parenthetically that if this had been done, there can be no doubt that such an enterprise could have been classified as a "public utility", subject to detailed regulation by the state. Yet it is inexorably insisted that if the municipality itself conducts such an enterprise, it is "private". The intellectual bankruptcy of such reasoning is evident.

[13] Section 6 and 4, Act No. 99, Laws of Puerto Rico, 1931.

430

continue to operate it for the same purpose. And the sole reason advanced therefor is that the statute under which it presently operates the aqueduct is permissive rather than mandatory. It is impossible to follow this argument to a rational conclusion. The municipality is a subdivision and agent of the state and exists at its will. A waterworks operated by the state would be governmental. A mandatory statute providing that the municipality operate the waterworks would make it a governmental activity. But somehow if the statute only "authorizes" this legitimate activity carried on in a field vital to public health, it becomes "private". This is indeed piling one label on top of another with no purpose we can see except to attain a particular result. The appellee itself demonstrates the artificiality of this view when it argues that the Transportation Authority is engaged in a governmental activity in operating a bus line, merely because the Legislature has directed instead of authorized the Authority to engage in such activity. To call transportation governmental and supplying water private, is to ignore the realities of life. If there were some compelling need for such a legal fiction, we might conceivably be persuaded to indulge in it. But what we are being asked to do is to enshrine a legal fiction, utilized in the common law and in our cases to attain a just and convenient result in other fields of law, as an inflexible and automatic rule of property law. Whatever other courts may have done, we cannot take such a step.[14] The matter comes down to this: The municipality is no more entitled to complain than another agency operating on an island wide level—such as the Communication

---

[14] We are in agreement with the reasoning of *Higginson* v. *Slattery*, 99 N.E. 523 (Mass., 1912), cited by appellee itself. The court there points out that (p. 527): "Although the establishment of this park was permissive and not compulsory, this distinction is not decisive. It is the character of the use which stamps a given municipal venture as public or proprietary." The Supreme Court of the United States has also rejected this theory of the district court. In *Ger. Alliance Ins. Co.* v. *Home Water Co.*, 226 U. S. 220, at pp. 227–8, that Court said: "But the city was under no legal obligation to furnish the

Authority or the Water Resources Authority itself—if its functions were transferred to another agency. Whether the policy embodied in the Act before us is fair or wise is not within our province and can have no effect on our decision of this case. And whether the municipality shall be compensated under such circumstances is a matter for the Legislature, not this court, to determine.

We note finally that *Brush* v. *Commissioner*, 300 U. S. 352, cited by appellants, and *Helvering* v. *Gerhardt*, 304 U. S. 405, cited by appellee, are tax cases and therefore not directly in point herein. The *Brush* case holds that an officer of the New York City Waterworks was engaged in an essential governmental function within the meaning of a Federal Treasury Regulation exempting from the Federal income tax the compensation of state officers and employees for services rendered in connection with an essential governmental function of the State. Here again we see the familiar process of using the characterization which will produce the result which under all the circumstances the Court believes will best serve the ends of justice. In brief, the New York waterworks is governmental for the purpose of determining Federal income tax liability of its employee;[15] and private or proprietary in tort law, in order to avoid the im-

water; and if it voluntarily undertook to do more than the law required, it did not thereby subject itself to a new or greater liability. It acted in a *governmental* capacity, and was no more responsible for failure in that respect that it would have been for failure to furnish adequate police protection." (Italics ours). And even assuming, as appellee asserts, that *Coyle* v. *Gray*, 30 A. 728 (Del., 1884), stands alone in holding that property owned by a municipality is always held for public purposes, we are prepared to follow that case, at least for the purposes of the particular problem before us.

[15] In spite of the fact that the *Brush* case is not directly in point herein, the language of Mr. Justice Sutherland therein illustrates graphically why in the *Brush* case as well as in the instant case there was a compelling need to call operation of a waterworks governmental. We feel it appropriate to close our discussion of this phase of the present case by quoting that language *in extenso*, as found at pp. 362–3, 364, 365, 366, 368, 370–1:

"There probably is no topic of the law in respect of which the decisions of the state courts are in greater conflict and confusion than that which deals with the differentiation between the governmental and corporate powers of

munity from liability flowing from governmental operations. But, as we have seen, use of either of these labels is irrelevant when we are confronted with a claim by a municipality that transfer by the state of its aqueduct to an other governmental agency without compensation would despoil it of its property in violation of its constitutional rights.

All we need say in the instant case therefore is that ownership and operation of its aqueduct by the Government of the Capital is a proper activity of a government agency. This statement, we make it clear, does not close the door against a holding in some future case which does not involve a constitutional question that for the purposes of property law a municipality owns an aqueduct either (*a*) in its private, or (*b*) in its governmental capacity. Our holding amounts only to a refusal to permit the use of a legal fiction inappropriate to the facts of the case to dictate the decision of this case.

---

municipal corporations. This condition of conflict and confusion is confined in the main to decisions relating to liability in tort for the negligence of officers and agents of the municipality. In that field, no definite rule can be extracted from the decisions. It is true that in most of the state courts, including those in the State of New York, it is held that the operation of water works ·fall within the category of corporate activities; and the city's liability is affirmed in tort actions arising from negligence in such operation. But the rule in respect of such cases, as we pointed out in *Trenton* v. *New Jersey*, 262 U.S. 182, 192, has been 'applied to escape difficulties, in order that injustice may not result from the recognition of technical defenses based upon the governmental character of such corporations'; and the rule is hopelessly indefinite, probably for that very reason.

"That is not, however, an action for personal injuries sounding in tort, but a proceeding which seeks in effect to determine whether immunity from federal taxation, in respect of the activity in question, attaches in favor of a state-created municipality—an objective ·so different in character from that sought in a tort action as to suggest caution in applying as the guide to a decision of the former a local rule of law judicially adopted in order to avoid supposed injustices which would otherwise result in the latter.

"The rule in respect of municipal liability in tort is a local matter; and whether it shall be strict or liberal or denied altogether is for the state which created the municipality alone to decide (*Detroit* v. *Osborne*, 135 U.S. 492, 497–498) provided, of course, the Federal Constitution be not infringed. . . .

"* * * * * * *

We recognize that this is in practical effect a ruling that, for the purposes of the present case, The Capital owns and operates its waterworks in its public or governmental capacity. Once it is made clear that the holding is confined to the facts of this case, we find it both fair and consistent with tort cases like *Colón* v. *Capital of Puerto Rico, supra,* and tax cases like *Brush* v. *Commissioner, supra.*

## II

■ There is no dispute between the parties on the proposition that whether a particular function of a municipality is governmental or proprietary is for this Court to decide as a question of local law. We have so treated it in com--

---

"We think, therefore, that it will be wise to confine, as strictly as possible, the present inquiry to the necessities of the immediate issue here involved, and not, by an attempt to formulate any general test, risk embarrasing the decision of cases in respect of municipal activities of a different kind which may arise in the future . . . .

"The public interest in the conservation and distribution of water for a great variety of purposes—ranging from ordinary agricultural, domestic and sanitary uses, to the preservation of health and of life itself—is obvious and well settled. For the modern city, such conservation and distribution of water in sufficient quantity and in a state of purity is as vital as air. And this vital necessity becomes more and more apparent and pressing as cities increase in population and density of population . . . .

" * 　 * 　 * 　 * 　 * 　 * 　 *

"While these [earlier Supreme Court cases] cases do not decide, they plainly suggest, that municipal waterworks created and operated in order to supply the needs of a city and its inhabitants are public works and their operation essentially governmental in character. Other decisions of this court, however, more directly support that conclusion.

" * 　 * 　 * 　 * 　 * 　 * 　 *

"We conclude that the acquisition and distribution of a supply of water for the needs of the modern city involve the exercise of essential governmental functions, and this conclusion is fortified by a consideration of the public uses to which the water is put. Without such a supply, public schools, public sewers so necessary to preserve health, fire departments, street sprinkling and cleaning, public buildings, parks, playgrounds, and public baths, could not exist. And this is equivalent, in a very real sense, to saying that the city itself would then disappear . . . . It may be, as it is suggested, that private corporations would be able and willing to undertake to provide a supply of water for all purposes; but if the State and City of New York be of opinion, as they evidently are, that the service should not be entrusted to private hands but should be

ing to the foregoing conclusions. But that is not the only problem involved in this case. We still have the question of constitutionality.

Most of the state cases, whether grounded on the question of local law or of constitutionality, were decided prior to *Trenton* v. *New Jersey,* 262 U. S. 182. That case has had a profound effect on the problem before us, and therefore deserves careful examination.

In the *Trenton* case the State of New Jersey had granted to a corporation the right to take water from, the Delaware River to supply the residents of Trenton. Thereafter, Trenton, pursuant to authority granted by the state, purchased the property, franchises, and privileges of the corporation. The legislature subsequently passed a statute providing for a license fee on municipalities for the diversion in excess of a certain amount of water from rivers for purposes of public water supply. The case came to the Supreme Court of the United States on writ of error from the State Supreme Court which had affirmed a judgment in favor of the State against the City of Trenton for the unpaid license fees. The Supreme Court posed the issue as follows (p. 183):

"The State's right to recover depends upon the validity of an act of the legislature (c. 252, Laws of 1907). The City asserts that this act offends against the contract clause of the Constitution of the United States, and *that it takes property owned by the City in its*

---

rendered by the city itself as an appropriate means of discharging its duty to protect the health, safety and lives of its inhabitants, we do not doubt that it may do so in the exercise of its essential governmental functions.

"We find nothing that detracts from this view in the fact that in former times the business of furnishing water to urban communities, including New York, in fact was left largely, or even entirely, to private enterprise. The tendency for many years has been in the opposite direction, until now in nearly all the larger cities of the country the duty has been assumed by the municipal authorities. Governmental functions are not to be regarded as non-existent because they are held in abeyance, or because they lie dormant, for a time. If they be by their nature governmental, they are none the less so because the use of them has had a recent beginning."

*private or proprietary capacity* for public use without just compensation and without due process of law in violation of. the Fourteenth Amendment.'' (Italics ours.)

After stating the facts and discussing several early cases, the Court, speaking through Mr. Justice Butler, says at p. 188:

"The power of the State, unrestrained by the contract clause or the Fourteenth Amendment, over the rights and property of cities held and used for 'governmental purposes' cannot be questioned. In *Hunter* v. *Pittsburg, supra,* 179, reference is made to the distinction between property owned by municipal corporations in their public and governmental capacity and that owned by them in their private or proprietary capacity, and decisions of this Court which mentioned that distinction are referred to. In none of these cases was any power, right or property of a city or other political subdivision held to be protected by the contract clause or the Fourteenth Amendment. *This. Court has never held that these subdivisions may invoke such restraints upon the power of the State.''* (Italics ours.)

In view of our above-noted conclusion that as a matter of local law the distinction between property owned by a municipality in its public capacity and that owned by it in its proprietary capacity has no practical purpose and is of doubtful validity on the question of property law involved herein, and in view of the fact that all courts have held, as Mr.' Justice Butler points out and as The Capital concedes, that "The power of the State . . . over the rights and property held and used for 'governmental purposes' cannot be questioned", our discussion of the *Trenton* case might well stop at this point. No city, as the *Trenton* case says, has ever persuaded the Supreme Court that it was entitled to invoke the Constitutional provisions involved against the State. We are unable to see why we should reach a contrary result.

But the *Trenton* case goes much farther. It holds that even in those cases where state courts conclude that they wish as a matter of local law to characterize such property

as held by a municipality in its private or proprietary capacity, the Federal Constitution does not bar the taking by the State of such property or any interest therein without compensation. The language of the Supreme Court is worth quoting in full on this point. The Court says at pp. 191, 2:

"The distinction between the municipality as an agent of the State for governmental purposes and as an organization to care for local needs in a private or proprietary capacity has been applied in various branches of the law of municipal corporations. The most numerous illustrations are found in cases involving the question of liability for negligent acts or omissions of its officers and agents. See *Harris* v. *District of Columbia*, 256 U. S. 650, and cases cited. It has been held that municipalities are not liable for such acts and omissions in the exercise of the police power, or in the performance of such municipal faculties as the erection and maintenance of a city hall and courthouse, the protection of the city's inhabitants against disease and unsanitary conditions, the care of the sick, the operation of fire departments, the inspection of steam boilers, the promotion of education and the administration of public charities. On the other hand, they have been held liable when such acts or omissions occur in the exercise of the power to build and maintain bridges, streets and highways and waterworks, construct sewers, collect, refuse and care for the dump where it is deposited. Recovery is denied where the act or ommission occurs in the exercise of what are deemed to be governmental powers, and is permitted if it occurs in a proprietary capacity. The basis of the distinction is difficult to state, and there is no established rule for the determination of what belongs to the one or the other class. It originated with the courts. Generally it is applied to escape difficulties, in order that injustice may not result from the recognition of technical defenses based upon the governmental character of such corporations. *But such distinction furnishes no ground for the application of constitutional restraints here sought to be invoked by the City of Trenton against the State of New Jersey. They do not apply as against the State in favor of its own municipalities. We hold that the City cannot invoke these provisions of the Federal Constitution against the imposition of the license fee or charge for diversion of water specified in the state law here in question. In view of former opinions of this Court, no substantial federal question is presented.*" (Italics ours).

The appellee attempts to restrict the scope of the decision in the *Trenton* case. It asserts that "the *Trenton* case decided that the state had power to control and preserve the use of its water resources for the benefit of its inhabitants, and that the state could grant or withhold said privilege as it saw fit." The district court agreed with the appellee. In discussing the *Trenton* case in its opinion, the district court said that the Supreme Court "held that the State has power and it is its duty to control and conserve the use of water resources for all of its inhabitants", that the only way the City could obtain water was to purchase it from the State, and "that the power to determine the conditions under which water may be taken from the rivers and lakes of the State is a legislature function". Apparently the appellee and the district court would have us treat those statements as the holding of the Court and the remaining portions of the opinion quoted above as *dicta*.

We cannot take this view of the *Trenton* case. On the contrary, what the appellee calls the holding consists of a series of preliminary statements of obvious and settled local law. The only question before the Supreme Court for *decision*, as we have already seen from the language of the Supreme Court itself, was the Federal constitutional question. And on that the Court held that the Federal constitutional safeguards cannot be invoked by a municipality to restrain a state from taking the property of the municipality without compensation, irrespective of whether such property is characterized as a matter of local law as held by the municipality in its governmental or in its proprietary capacity.

Indeed, the appellee at one point in its brief recognizes that some effect must be given to the above-quoted sweeping language of the *Trenton* case. Its brief says that "in general terms, it was decided in the *Trenton* case, that the state has *powers* over the rights and property of cities and municipalities that are not limited by the contract and due process clauses of the *Federal Constitution,* The opinion ends

declaring that no *'federal question'* was involved''. (Italics appellee's.) The appellee, is of course, correct in stating that, on final analysis, the Supreme Court concluded that no substantial Federal question was involved in the *Trenton* case. But in order to so hold, the Court first had to hold that no Federal constitutional provision could be involved against the State by a municipality under such circumstances. And there is not the slightest intimation by the Supreme Court that its holding is confined to the ''powers'' vested in States to control their water resources. On the contrary, its language is as broad as any that could be written. We assume that the language of the Supreme Court (p. 192) ''They [the contract clause and Fourteenth Amendment] do not apply as against the State in favor of its own municipalities'' means exactly what it says. And certainly the Supreme Court has so understood its own holding and language in subsequent cases,[16] as have other courts[17] and secondary authorities.[18]

---

[16] ''The city cannot invoke the protection of the Fourteenth Amendment against the State.'' (citing *Trenton* v. *New Jersey*) *Newark* v. *New Jersey*, 262 U.S. 192, 196 (1923).

''The power of the State and its agencies over municipal corporations within its territory is not restrained by the provisions of the Fourteenth Amendment.'' (citing *Trenton* v. *New Jersey*) *Risty* v. *Chicago, R. I. & Pac. Ry. Co.*, 270 U.S. 378, 390 (1926).

''A municipal corporation, created by a state for the better ordering of government, has no privileges immunities under the federal constitution which it may invoke in opposition to the will of its creator.'' (citing *Trenton* v. *New Jersey*) *Williams* v. *Mayor*, 289 U.S. 36, 40 (1933).

''Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator.'' (citing *Trenton* v. *New Jersey*) *Coleman* v. *Miller*, 307 U.S. 433, 441 (1939).

[17] *Cranford Co.* v. *City of New York* (C.C.A. 2d, 1930) 38 F. (2d) 52, cert. denied 281 U.S. 760; *Franklin Tp. in Somerset County, N. J.* v. *Tugwell*, 85 F. (2d) 208, 13 (C.C.A.D.C., 1936); *City of Tulsa* v. *Oklahoma Natural Gas Co.*, (Dist Ct., Okla., 1925) 4 F. (2d) 399, app. dismissed 269 U.S. 527; *Henderson* v. *Twin Falls County*, 80 P. (2d) 801 (Idaho, 1938); *Jersey City* v. *Martin*, 19 A. (2d) 40 (N.J., 1941); *State ex rel. Martin* v. *City of Juneau*, 300 N.W. 187 (Wis., 1941); *State* v. *Marin Municipal Water Dist.*, 111 P. (2d) 651 (Calif., 1941).

[18] Doddridge, Distinction Between Governmental and Proprietary Functions

The effort to distinguish the *Trenton* case on various other grounds is untenable. For example, the appellee asserts that the law therein involved did not purport to deprive the municipality of its property. But it did provide that the city would have to pay all over again for what it had previously purchased from a private owner, which is substantially the same thing. And certainly the Supreme Court treated the Act as one taking the property of the city.

It goes without saying that the state may be restrained from transferring municipal property to private persons. (See *New Orleans, M. & C. R. Co.* v. *City of New Orleans,* 26 La. Ann. 478 (1874); *Ellerman* v. *McMains,* 30 La. Ann. 190, 31 Am. Rep. 218 (1878)). But we need hardly add that no such transfer is contemplated by Act No. 39.

We also note in passing that two of the cases cited by the district court (*St. Louis* v. *Western Union Telegraph Co.,* 148 U.S. 92 (1893) and *Town of Nahant* v. *United States,* 136 F. 273 (C.C.A. 1st, 1905)) present a different constitutional question, as they relate to the taking of municipal property by the federal government, which is a separate sovereign and which is not the creator or principal of the municipality involved. In the same way, *The People* v. *Mun. of San Juan,* 19 P.R.R. 625, has no application herein. That case stands only for the proposition that, in the absence of specific legislation to that effect, the Insular Government cannot deprive a municipality of its property. But Act No. 39 is just such legislation. It is true that the Civil Code and the Condemnation Law[19] previously provided that

of Municipal Corporations, 23 Mich. L. Rev. 325, 332–33; Schulz, The Effect of the Contract Clause and the Fourteenth Amendment Upon the Power of the States to Control Municipal Corporations, 36 Mich. L. Rev. 385; Robertson & Kirkman, Jurisdiction of the Supreme Court of the United States, pp. 502–3; 37 Harv. L. Rev. 159–60; 116 A.L.R. at 1038, 9.

[19] Sections 256 and 282, Civil Code; Condemnation Law, Revised Statutes and Codes of Puerto Rico, 1941 ed., p. 821.

440

a municipality shall be compensated for its property when taken by the People of Puerto Rico. But the subsequent aqueduct Law is "a complete law itself constituting an entire Act of legislation on the subject with which it deals, and it may therefore amend or supersede by implication provisions of prior acts." (*Vidal* v. *Fernández*, 104 F. (2) 606, 608, (C.C.A. 1st, 1939)). The Aqueduct Law specifically provides that in the case of municipal aqueducts, the compensation shall be in the limited manner therein set forth. The general legislation relating to compensation to municipalities for their property when taken by the People of Puerto Rico therefore is obviously repealed *pro tanto,* as indeed §18 provides.[20]

It remains only to add that the distinction found in §256[21] of the Civil Code between the two types of property owned by municipalities—"property of public use" as against "common property" (*bienes patrimoniales*)—does not necessarily carry with it all the same legal consequences which have been developed in the common law as a matter of judge-made law in distinguishing between property owned by a municipality in its governmental as against its proprietary capacity. The civil law distinction merely notes the differences between public property which is used freely by the general public such as squares, streets, and parks, as against *bienes patrimoniales,* which are used for public purposes but without constant and general access thereto by the public.

---

[20] Section 18 of the Aqueduct Law reads as follows:

"All laws. or parts of laws in conflict herewith are hereby repealed."

[21] Section 256 of the Civil Code reads as follows:

"The property of public use in Porto Rico and the towns thereof comprises the Insular and local roads, the squares, streets, fountains and public waters, walks, and public works for general use, paid for by the said towns or from the Treasury of Porto Rico.

"All other property, possessed by either The People of Porto Rico or the municipalities thereof, is common property for the use of the general and municipal governments (*bienes patrimoniales*), and shall be governed by the provisions of this Code."

But we find nothing in that concept which makes it mandatory for us to hold that *bienes patrimoniales* of a municipality are "private property" in which the municipality forever holds a vested property interest of which it cannot be deprived without full compensation by the Legislature in a subsequent Act deliberately designed to accomplish that purpose. And if more be needed, the contrary argument in any event fell by the wayside when municipalities, whatever their status may have been under Spain, became under the Organic Act mere subdivisions of the insular government, with all the consequences which we have seen are a part of that status.

Nor is the constitutional question involved herein affected by *Vilas* v. *Manila*, 220 U. S. 345, which is cited by the district court for the proposition that the Supreme Court recognized the distinction between governmental and proprietary functions. The district court was undoubtedly correct in that statement. But it must be noted that the distinction was used to make the claims of creditors of the old city of Manila effective against the new city of Manila established after the cession of the Philippines to the United States. This only illustrates that the distinction still proves useful in fields other than constitutional or property law. But the fact that it has proved to be in the past an effective legal fiction in tort or contract law does not, as already noted, inexorably require us to apply it herein.

It is not necessary in this case to express our views on the contention of appellants that the due process, contract, and just compensation clauses of our Organic Act are not local laws; that cases arising thereunder do not involve local questions on which, under familiar Supreme Court decisions, our views prevail unless inescapably wrong; and that we are therefore bound by the *Trenton* case on the question under consideration. Congress has placed this court in

a position subordinate to the Circuit Court of Appeals and the Supreme Court of the United States. It is therefore difficult to conceive of a situation in which we would undertake to differ with the Supreme Court on interpretation and application of those fundamental provisions of our Organic Act which have been substantially copied from the Federal Constitution. Cf. *General Motors Acceptance Corporation* v. *Brañuela,* 61 P.R.R. 701, 705).

In any event, the problem does not arise in this case, in view of our whole-hearted agreement with the holding and language of the *Trenton* case that those constitutional clauses cannot be invoked by a municipality against the State. And assuming, as appellee asserts and appellants do not dispute, that, apart from the constitutional question involved, the decision as to whether to characterize a municipal activity as governmental or proprietary involves a question of local law, we have, as already noted, resolved that question against the municipality for the purposes of this particular case. We are therefore constrained to by-pass the fascinating questions which have not as yet been explored in connection with the inescapably wrong doctrine (See *De Castro* v. *Board of Com'rs of San Juan,* 136 F. (2d) 419 (C.C.A. 1st.; 1943); cert. granted February 28, 1944).

## III

 The appellee also seeks to have us hold that Act No. 39 is invalid because of its alleged failure to conform to §34, paragraph 8, of our Organic Act that "No bill . . . shall be passed containing more than one subject, which shall be clearly expressed in its title . . .". (48 U.S.C.A. §832).

The argument of the appellee is that the title of Act No. 39 is misleading in that it reads in part "An Act . . . to Make the Necessary Provision for Valuing the Municipal Properties Transferred to the Water Resources Authority

and to Compensate the Municipalities for the Value Thereof", whereas the text of the Act fails to provide for just compensation. The appellants assert that the title is valid because the Act does provide for some form of compensation; and that, in any event, as §832 of Title 48, U.S.C.A., also provides that "if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed", we should simply strike down as invalid the Section of Act No. 39 providing for limited compensation and uphold as valid the Act as a whole as authorizing the transfer of municipal aqueducts without compensation therefor (Crawford on Satutory Construction, §146, pp. 221–2).[22]

In recent years there has been a tendency on the part of our Legislature to provide titles for its enactments which, in the words of the appellees, are "stated in such extreme detail as to put them almost in a *class* by themselves". These titles are frequently almost as long as the statutes themselves, and undertake to describe and even to summarize the contents of each section of the Acts involved. Undoubtedly such meticulously detailed titles have the laudable purpose of compliance with §34, paragraph 8, of the Organic Act. But Congress never intended that a legislator need look no further than the title of a statute to determine its contents. A title is not a substitute for a statute; it serves only as a guidepost to lead one into the statute itself, where one is expected to find its detailed provisions. Once the "subject" of a bill has been "clearly expressed in its title", the function of the title is exhausted. Earlier legislatures understood this. Our statute books are full of long and complicated Acts the titles of which are simple and

---

[22] This Section reads as follows:

"As we have elsewhere stated, those provisions of a statute not properly referred to or expressed in the title, will be invalid in many situations. Where this occurs, the question naturally arises concerning the effect of such invalidity

straightforward, consisting of three or four lines of text. These statutes have either never been assailed in the courts, or have been upheld as containing a subject which is clearly expressed in the title (See *Rivera* v. *District Court*, 62 P.R. R. 518, 544, 545).

But—and here we come to the heart of the matter—when the Legislature, for reasons of its own not strictly required by the provisions of the Organic Act, chooses to summarize the contents of an Act in its title rather than simply to express therein its subject, it runs the risk that such a summary will be so inaccurate that it will be substantially misleading as to material portions of the Act. That is exactly the situation we are faced with in this case. If the title of Act No. 39—which is appended in the margin as an example of unnecessary prolixity in the title of a statute[23]—had simply failed to mention the issue of compensation, we might

---

upon those provisions which are adequately expressed in the title. The same general principles are applicable here as in those situations where the partial invalidity results from other defects. Thus, if all the provisions contained in the statute are so related and inseparably connected that the rejection of the invalid portion leaves the law incomplete, unintelligible or incapable of being executed, the entire enactment will be invalid. Conversely, if the valid provisions are independent and complete in themselves, sensible and capable of being executed, they will be effective. Nevertheless, if the statute reveals that the legislature enacted the valid provisions because of the invalid provisions, the whole act falls. And the same is true where it appears that the legislature would not have enacted the statute at all if any of its provisions were to be omitted.''

[23] ''An Act To protect the health of the inhabitants of Puerto Rico through the uniform and efficient operation of the several waterworks systems; to cooperate with the municipalities of Puerto Rico in the improvement of this service under a plan of adequate coordination guaranteeing to all towns ample provision for potable water; to empower the Puerto Rico Water Resources Authority to establish, operate and administer such systems of storing and supplying potable water as may be necessary for the use the use of the inhabitants of the urban and rural districts of Puerto Rico; to entrust the Commissioner of Health of Puerto Rico with the inspection of all public systems of storing and supplying potable water, and to fix his functions and duties in connection with such inspection; to fix the procedure for the conveyance to the Puerto Rico Water Resources Authority of the administration and operation of any waterworks system which may constitute a menace to public health; to coordinate the operation of the several waterworks services under the jurisdiction of the Puerto

conceivably have held, following *Rivera* v. *District Court, supra,* that the subject of the Act had nevertheless been expressed in the title and that its failure to mention compensation was not necessarily fatal. But the Legislature did undertake to describe in the title the compensation the Act provided. Having chosen to write a detailed title, the Legislature must make certain that such detailed information is not misleading in the manner indicated.

· However, in the particular case before us, we never reach the question of whether the title of Act No. 39 is sufficiently misleading to render the Act invalid under this test. We are stopped short in our examination thereof for the simple reason that The Capital has no standing to raise this question. As we recently phrased it, "the constitutionality of a statute can not be challenged unless the person who attacks it shows that said statute deprives him of rights protected by the Constitution" (*College of Pharmacists* v. *Board of Pharmacy,* 60 P.R.R. 789, 794).

---

Rico Water Resources Authority; to transfer to said Authority, in order best to obtain this coordination, such properties as are connected with the furnishing of water and belong to the municipalities of Puerto Rico, including the Capital of Puerto Rico; to confer on the Puerto Rico Water Resources Authority power to receive, possess, and administer such properties; to empower it to carry out such acts as may be necessary in order to incorporate and organize in accordance with law the subsidiary corporation or corporations that it may deem advisable for the purposes of possessing, maintaining, and administering any or all the property hereby transferred to it; to authorize the Governor of Puerto Rico to fix the date on which the conveyances of property hereby determined must be made; to establish standards for the rates to be collected for the services of water; *to make the necessary provision for valuing the municipal properties transferred to the Water Resources Authority and to compensate the municpalities for the value thereof; to provide for the annual payments which the Water Resources Authority will have to make to the municipalities whose waterworks are transferred under this Act;* to empower the Water Resources Authority to issue bonds for the improvement, extension and repair of waterworks systems and for the construction of systems, up to the sum of five million (5,000,000) dollars, with the security of the property of said waterworks and/or the receipts thereof; to empower it, further, to accept donations, subsidies, appropriations, and perquisites from agencies or instrumentalities of the Governments of the United States and of Puerto Rico, and for other purposes." (Italics ours).

The Organic Act is our Constitution. An Act of our Legislature which runs afoul of one of its provisions is therefore unconstitutional. But we have already seen that constitutional provisions of a considerably higher dignity—the due process, contract, and privileges and immunity clauses—cannot be invoked by a municipality against its creator, the State. The hard fact is that there cannot be found within the Organic Act a peg on which to hang the legal interest of the municipality. And legal interests there must be, if the courts are to afford protection. We assume, without deciding, that the municipality will be injured by this Act. But mere injury is not enough—such injury might only constitute *damnum absque injuria.* There must be a demonstration of the invasion of one's legal rights. The language of Mr. Justice Roberts in *Tennessee Electric Power Co.* v. *T. V. A.,* 306 U.S. 118, is apt in this connection. He says at pp. 137, 8:

"The appellants invoke the doctrine that one threatened with direct and special injury by the act of an agent of the government which, but for statutory authority for its performance, would be a violation of his legal rights, may challenge the validity of the statute in a suit against the agent. The principle is without application unless the right invaded is a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a status which confers a privilege. . . ."

One could scarcely contend that the parties assailing legislation in *Alabama Power Co.* v. *Ickes,* 302 U. S. 464, *Perkins* v. *Lukens Steel Co.,* 310 U. S. 113, 125 and *Porto Rico Ry. Light & Power Co.* v. *Colom,* 106 F. (2d) 345, 354 (C.C.A. 1st, 1939), would not suffer actual injury if those statutes remained in effect. But the courts nevertheless found that such injury did not amount to an invasion of a legal right; the parties were therefore denied access to the courts in their effort to invalidate the statutes involved therein.

This doctrine, as we have seen, applies to the rights of private parties, as in the *Alabama Power Co.* and *Porto Rico*

*Ry. Light & Power Co.* cases. There is a considerably more important public policy involved in applying it to litigation between the sovereign and one of its public subdivisions. As we have already noted, even the most fundamental constitutional provisions cannot be invoked by a municipality against its creator, the State. We are unable to see how an allegedly defective title of an Act "legally injures" a municipality when the Act itself, although taking the property of the municipality without due process of law, does not, as we have already held, "legally injure" the municipality. It will not do to argue that the Legislature could take the action contemplated herein only by a valid law and that an Act with a defective title is not a valid law. That would, indeed, be lifting one's self by one's own bootstraps. The requisite legal interest of a party cannot be gathered from the Act itself, be it valid or invalid. It is only when the legal interest of the party already exists independently and apart from the Act—indeed, prior to its passage—that an aggrieved party is entitled to attack the Act if and when it is enacted with the infirmity alleged herein.

The impact of this argument as applied to this case becomes manifest when we recall that a municipality is a mere subdivision of the Insular Government.[24] It is just as though the Commissioner of the Interior, for example, were contending that he would be legally injured by an Act of

---

[24] In *People ex rel. Castro v. Padrón Rivera,* 60 P.R.R. 777, we said at pp. 786–7: "Even though the insular branch and the municipal branch appear to function as distinct and separate entities, both are in reality parts of a single governmental instrumentality—The Government of Puerto Rico . . . The municipal subdivisions or municipalities of Puerto Rico are creatures of the Legislature of Puerto Rico, which is one of the three branches of the Government of Puerto Rico. It is the Insular Legislature which can give life to new municipalities and which has the power to consolidate two or more of those already in existence into a single one. The laws governing the municipalities are enacted by the Insular legislators and it is the latter who create the municipal offices and who fix or increase the salaries of the officers. The taxes on the real property situated within the limits of the respective municipalities are collected by officers of the Insular Government and deposited in the respective

the Legislature transferring some of his functions to the Commissioner of Agriculture and would therefore have standing to file suit to invalidate such an Act. Neither the Commissioner of the Interior in that case nor the municipality in our case would have access to the courts to attack such Acts because of their allegedly defective titles. They, or anyone else, can challenge in the courts only Acts which visit direct and personal injury upon them. There must be "an injury or threat to a particular right of their own, as distinguished from the public's interest in the administration of the law".[25]

We can readily envisage the chaotic conditions which would ensue if this court through the medium of suits for declaratory judgments were converted into an inter- and intra-agency disputes division to render legal opinions for subordinate executive agencies or officials as to whether legislation transferring their functions to other subordinate agencies or officials was defective. Our judicial system was not designed for that purpose. If it were so used, it would soon break down. Even if we were authorized to invade this area of governmental operations such action would be contrary to the trend of our judicial history of many years' standing (*Tyler* v. *Judges of Court of Registration,* 179 U. S. 405; Roberston and Kirkham, *supra,* Chapter 33, p. 467, *et seq.*). The courts, to put it badly, have wisely held that such a dispute does not constitute a justiciable controversy.

In the light of *Trenton* v. *New Jersey* and the principles just enunciated, for us to hold in the case before us that the

---

municipal treasuries. Municipal b᷑ ..d issues require for their validity and effectiveness the previous appro᷑ of the Insular Government. All this clearly shows that the municipal g᷑ ᷑ mments, due to the relations existing between them and the Insular Goᵥ ᵤinment and due to the supervision that the latter exercises over the former, are intᵣᵧal parts of the Government of Puerto Rico . . .''

[25] *Perkins* v. *Lukens Steel Co.,* 310 U.S. 113, 123. This is particularly true in a suit for a declaratory judgment (*College of Pharmacists* v. *Insular Board of Pharmacy,* 60 P.R.R. 789).

title of Act No. 39 is defective, would be for us to create a justiciable controversy where none exists. The title of that Act may be legally defective. But a subdivision or agent of the state created by the Legislature has no legal interest or standing to press that constitutional contention against this legislation.

## IV

The principal issue litigated by the parties and decided by the district court was the constitutionality of the Act in view of its failure to provide for just compensation. That issue has been resolved by us against The Capital. And we have held that once this principal issue of constitutionality was decided against the appellee, it had no standing to attack the Act because of its alleged violation of the constitutional provision with reference to titles of legislative enactments. By the same token, we cannot consider the contentions of the appellee that Act No. 39 is in conflict with certain other provisions of the Organic Act.[26]

But the position of The Capital is markedly different in connection with the provisions of the amended Act with reference to such items as annual payments, profits, and reserves. All of these are for the direct financial benefit of the municipality involved. The Capital therefore obviously has a standing in court when the meaning thereof is drawn into question.

In the instant case, however, the attack of the appellee on these items was directed chiefly at demonstrating that they did not constitute just compensation in the constitu-

---

[26] Some of these contentions are: Act No. 39 impairs the obligations of The Capital upon contracts with third persons; the conferring of certain powers and duties on the Executive Council and the Commissioner of Health is in violation of the Organic Act; Act No. 39 creates a new executive department in violation of the Organic Act; the said Act violates the provision of the Organic Act vesting the power to grant franchise in the Public Service Commission.

Apparently these contentions were not strongly pressed in the district court, and the district court expressed no opinion thereon.

tional sense. Since that particular point was conceded, the district court did not pass in detail on the meaning of these provisions of the statute. These Sections of the Act are difficult to understand. When pressed at the oral argument to explain them, counsel for the Water Resources Authority stated that he likewise had difficulty understanding the provisions for compensation in the Act and asserted that they stand badly in need of amendment. We agree with counsel that they are complex and confusing. But, although the appellee is entitled to raise these questions, we are reluctant to pass on such detailed matters *in vacuo* within the framework of this particular suit for a declaratory judgment. We need more light on what these provisions mean and how they will work in specific cases. If they remain in the statute in unamended form and if they come before us in an appropriate proceeding presenting a concrete problem, we shall give them the careful consideration they deserve. Meanwhile, we emphasize that the sole question [27] which we have decided on the merits in this appeal is that the Legislature may constitutionally provide for transfer of the title and operation of an aqueduct owned and operated by a municipality without making provision for compensation to the municipality for the property involved, provided it ensures continued operation of the aqueduct for the benefit of the inhabitants of the said municipality.

For the reasons stated herein, the judgment of the district court will be reversed and a new judgment will be entered declaring that Act No. 39 as amended is not invalid because of its failure to provide for just compensation in the event of the transfer of the aqueduct of The Capital, to the Water Resources Authority under the terms of the said Act.

---

[27] For example, the rights of holders of outstanding bonds, if any, of the municipality and of its creditors are not before us and we make no comment thereon.