No. 92-376

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

GARY STRATEMEYER,

    Claimant and Respondent,

v.

LINCOLN COUNTY,

    Employer,

and

MACO WORKERS' COMPENSATION TRUST,

    Defendant and Appellant.

*FILED*

*JUN 23 1993*

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   The Montana Workers' Compensation Court
               The Honorable Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Norman H. Grosfield, Utick & Grosfield,
        Helena, Montana (argued)

    For Respondent:

        Sydney E. McKenna, Patterson, Marsillo, Tornabene,
        Schuyler & McKenna, Missoula, Montana (argued)

    For Amicus Curiae:

        John J. Richardson, Beck Law Offices, Bozeman,
        Montana, for Montana Trial Lawyers Association;
        Charles G. Adams, Helena, Montana, for State
        Compensation Mutual Insurance Fund; Robert E.
        Sheridan, Garlington, Lohn & Robinson, Missoula,
        Montana, for Montana Self-Insurers Association

Submitted: December 16, 1992

Decided: June 23, 1993

Filed:

_____
Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from an order of the Worker's Compensation Court, concluding that subsections (3)(a) and (b) of § 39-71-119, MCA (1987), violate Article II, Section 4 of the Montana Constitution. We reverse.

The sole issue on appeal is whether the Workers' Compensation Court erred in concluding that subsections (3)(a) and (b) of § 39-71-119, MCA, violate Article II, Section 4 of the Montana Constitution, which states . . . "[n]o person shall be denied the equal protection of the laws . . . "

Gary Stratemeyer (Stratemeyer) was a deputy sheriff for Lincoln County from 1982 to 1990. On May 4, 1990, Stratemeyer was called by the Sheriff's dispatcher to respond to a suicide attempt near the Libby office. When he arrived at the home, he was led to a back bedroom where he found a 17 year old girl being held by her father. She had shot herself in the head but was still alive. Respondent took the girl from her father's arms and administered first aid, including cardiopulmonary resuscitation, until the ambulance arrived.

When the ambulance arrived, the respondent helped the crew carry her to the ambulance. He then served as an escort for the ambulance to the hospital where he learned the girl had died. He was then called away from the hospital to another accident scene.

Thereafter, the respondent was continually plagued by thoughts of the girl's suicide. A few weeks after the suicide, the respondent took sick leave because of anxiety over the event. He

2

continued to suffer anxiety problems and was unable to return to work. Stratemeyer submitted a claim for Workers' Compensation on May 25, 1990, for a mental stress injury suffered during his employment as a police officer. The claim was denied on the basis that he had not suffered a "compensable injury" as defined by statute. (Statutory law prohibits coverage for a mental (stress) injury suffered without a physical component.) He then petitioned for a hearing before the Workers' Compensation Court for coverage of his medical costs and lost wages.

That court concluded that he did not suffer a "compensable injury" within the language of § 39-71-119, MCA. The Workers' Compensation Court also determined that this statute violated respondent's right to equal protection of the law because "claimant has been denied compensation based on the nature of his disability without regard to its cause as being work-related." Respondent contended, and the Workers' Compensation Court concluded, that the statute at issue was unconstitutional because it violated equal protection of the law.

There are limitations governing a court's ability to declare a statute unconstitutional. We take cognizance of the following cautions:

> [I]t is our sacred duty to measure the Act by the terms of our constitutional limitations, as we interpret them. "It must be evident to anyone that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility. The legislative and judicial are co-ordinate departments of the government of equal dignity; each is alike supreme in

3

the exercise of its proper functions, and cannot directly or indirectly while acting within the limits of its authority be subjected to the control or supervision of the other without an unwarrantable assumption by that other of power which, by the Constitution, is not conferred upon it. The Constitution apportions the powers of governments but it does not make any one of the three departments subordinate to another when exercising the trust committed to it. The courts may declare legislative enactments unconstitutional and void in some cases, but not because the judicial power is superior in degree or dignity to the legislative. Being required to declare what the law is in the cases which come before them, they must enforce the Constitution as the paramount law, whenever a legislative enactment comes in conflict with it."

State v. Dixon (1923), 66 Mont. 76, 84-85, 213 P. 227, 229.

Additionally:

When a legislative course of action expressed in statutes or budgetary laws is tested for constitutionality under the State Constitution, our review is circumscribed by certain principles. We must give the state constitutional provision a broad and liberal construction consistent with the intent of the people adopting it to serve the needs of a growing state. The constitutional provision should receive a reasonable and practical interpretation in accord with common sense. The constitutionality of a legislative enactment is prima facie presumed, and every intendment in its favor will be presumed, unless its unconstitutionality appears beyond a reasonable doubt. The question of constitutionality is not whether it is possible to condemn, but whether it is possible to uphold the legislative action which will not be declared invalid unless it conflicts with the constitution, in the judgment of the court, beyond a reasonable doubt.

Fallon County v. State (1988), 231 Mont. 443, 445-46, 753 P.2d 338, 339-340. (Citations omitted.) Every possible presumption must be indulged in in favor of the constitutionality of the Act. See State v. Safeway Stores, Inc. (1938), 106 Mont. 182, 199, 76 P.2d 81, 84.

With these principles in mind, we turn to the standard of

4

review for Workers' Compensation cases challenging a statute on the basis of equal protection. We have enunciated the following:

> [T]he right to receive Workers' Compensation benefits is not a fundamental right which would trigger a strict scrutiny analysis of equal protection. Nor does this statute infringe upon the rights of a suspect class.
>
> When a right determined to be less than fundamental is infringed upon by classification, the test applied by this Court is the rational relationship test. That is, does a legitimate governmental objective bear some identifiable rational relationship to a discriminatory classification.

Cottrill v. Cottrill Sodding Service (1987), 229 Mont. 40, 42-43, 744 P.2d 895, 897 (Citations omitted). In other words, is the classification (means) used to accomplish a legitimate governmental objective rational? The statute at issue here, because it affects no fundamental right or suspect class, must be analyzed under the rational basis test.

Section 39-71-119, MCA, excludes from the definition of injury work-related injuries that do not have a physical component. Section 39-71-119, MCA, reads as follows:

> (1)   "Injury ... means:
>       (a)   internal or external physical harm to the body.
>       . . .
> (3)   "Injury" or "injured" does not mean a physical or mental condition arising from:
>       (a) emotional or mental stress; or
>       (b) a non physical stimulus or activity.

The Workers' Compensation Court concluded that the respondent's injury was not covered under § 39-71-119, MCA, because it was a mental injury. The Workers' Compensation Court further concluded that the statute was unconstitutional because it improperly excluded people with mental injuries with no physical component from compensation under the Workers' Compensation Act in

5

violation of equal protection of the law. In applying the rational basis test to the exclusion for above conditions without a physical component, the Workers' Compensation Court stated that "[i]f a rational basis exists for the classification created by section 39-71-119, MCA (1987), the legislature must provide it. The Court may not speculate to find it." The court concluded that the classification did not meet the rational basis test because it could glean no purpose for the legislation from the statute itself or its legislative history.

However, appellant argues that the Workers' Compensation Court should have sought "any combination of purposes that the Legislature might have been attempting to achieve" in enacting § 39-71-119, MCA. The Ninth Circuit has stated: "[i]n our review of governmental purposes,...we need not rely only upon those purposes the legislature, litigants, or district court have espoused, but may also consider any other rational purposes possibly motivating enactment of the challenged statute." Mountain Water v. Mont. Dept. of Public Serv. Reg. (9th Cir. 1990), 919 F.2d 593, 597. See also; Kadrmas v. Dickinson Public Schools (1988), 487 U.S. 450, 462-463, 108 S.Ct. 2481, 2490, 101 L.Ed.2d 399; Cottrill v. Cottrill Sodding Service (1987), 229 Mont. 40, 43, 744 P.2d 895, 897; ([a]lthough this Court could speculate as to why the legislature elected to treat these select individuals differently under the Workers' Compensation laws....) (Emphasis added.) The purpose of the legislation does not have to appear on the face of the legislation or in the legislative history, but may be any

6

possible purpose of which the court can conceive. In this case, the Workers' Compensation Court expected the legislature to provide the purpose. This, however, is not required of legislation being examined relative to equal protection.

Appellant contends that the Workers' Compensation Court ignored the rule that legislation is presumed to be constitutional. Further, it did not require the respondent to meet his burden of proving the statute was unconstitutional. Appellant claims the respondent provided no testimony, no evidence nor any case law to argue that the statute was invalid. Respondent merely argued that the distinction between physical and mental injury claims was nonsensical and unfair.

This Court concludes that the Workers' Compensation Court did not properly apply these rules for analyzing legislation under an equal protection challenge. The Workers' Compensation Court did not presume the statute to be constitutional and look to any possible legitimate purpose for the legislation. However, resolving doubts in favor of the legislation in minimum level scrutiny cases is the proper approach because:

> [i]n the utilities, tax, and economic regulation cases, there are good reasons for judicial self-restraint if not judicial deference to legislative judgment. The legislature after all has the affirmative responsibility. The courts have only the power to destroy, not to reconstruct. When these are added to the complexity of economic regulation, the uncertainty, the liability to error, the bewildering conflict of the experts, and the number of times the judges have been overruled by events--self-limitation can be seen to be the path to institutional prestige and stability.
> The Court is aware, too, of its own remoteness and lack of familiarity with local problems. Classification is dependent on legislative purpose. Legislative purpose

7

> is dependent on the peculiar needs and specific difficulties of the community. The needs and difficulties of the community are constituted out of fact and opinion beyond the easy ken of the Court.

Joseph Tussman and Jacobus tenBroek, The Equal Protection of the Laws, 37 Cal. L. Rev. 341, 373 (1949). The legislature is simply in a better position to develop the direction of economic regulation, social and health issues.

Neither did the Workers' Compensation Court place a burden upon the respondent to bring evidence forward to show the statute was unconstitutional. In fact, the Workers' Compensation Court looked to the appellant for evidence that the statute was constitutional. "There is not a scintilla of fact, statistical or otherwise to demonstrate any actual cost or cost savings associated with the broad brush of exclusion brought by this legislation." The "heavy burden", however, rests with the party challenging the statute. Kadrmas at 463, 108 S.Ct. at 2490.

Even a cursory glance at the legislative history and statute indicates a concern over the high cost of the Workers' Compensation program to the State of Montana and the employers involved in the program. It is evident that this was the primary purpose for the legislative changes in the Workers' Compensation Act. "[P]romoting the financial interests of businesses in the State or potentially in the State to improve economic conditions in Montana constitutes a legitimate state goal." Meech v. Hillhaven West, Inc. (1989), 238 Mont. 21, 48, 776 P.2d 488, 504. (Citation omitted.) A purpose would be to provide for injured workers at a reasonable cost.

8

In addition, there are problems relative to mental stress claims, and they have caused a reluctance in some states to compensate for these claims. As we stated in Erhart v. Great Western Sugar Company (1976), 169 Mont. 375, 379, 546 P.2d 1055, 1057:

> Workmen's compensation cases normally deal with physical injury resulting from an accident, as the term is used in everyday language. When a shipping crate falls on a worker breaking a bone or two, the causation and the tangible happening are easily identifiable. In the present case we are dealing with a nervous disability, which may or may not be causally related to the employment situation.

The exclusion of mental claims rationally relates to the possible goal of reducing costs and having a viable program for the State and the enrolled employers and employees in the workers' compensation field.

Disallowing mental, or stress claims occurring without a physical component, while quite unfortunate for some, does not violate equal protection of the law.

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.

Eastman v. Atlantic Richfield Co. (1989), 237 Mont. 332, 339, 777 P.2d 862, 866, citing Williamson v. Lee Optical Co. (1955), 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563. (Citations omitted.) As we have stated in State v. Safeway Stores, Inc., 76 P.2d at 87, to wit:

9

On this phase of the question we again quote with approval from the West Coast Hotel Case, supra, wherein the court said: "This Court has frequently held that the legislative authority, acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach. The legislature 'is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be clearest.' If 'the law presumably hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.' There is no 'doctrinaire requirement' that the legislation should be couched in all embracing terms."

The concern over problems of administration of the Workers' Compensation program which prompted changes in the 1987 Workers' Compensation legislation might reasonably have called for a cautious approach. As stated in Joseph Tussman and Jacobus tenBroek, The Equal Protection of the Laws, 37 Cal. L. Rev. 341, 349 (1949):

> [t]he 'piecemeal' approach to a general problem, permitted by under-inclusive classifications, appears justified when it is considered that legislative dealing with such problems is usually an experimental matter. It is impossible to tell how successful a particular approach may be, what dislocations might occur, what evasions might develop, what new evils might be generated in the attempt to treat the old. Administrative expedients must be forged and tested. Legislators, recognizing these factors, may wish to proceed cautiously, and courts must allow them to do so.

Here, it is fairly obvious that the legislature was attempting to improve the financial viability of the system. This, they can do by rational means without violating the equal protection clause. Eastman, 777 P.2d at 866; Williamson, 348 U.S. at 489, 75 S.Ct. at 465.

Applying the general rules for analyzing the constitutionality

10

of a statute under the rational basis test, the Court concludes that the classification at hand rationally relates to a legitimate governmental objective of controlling the costs of the program and providing benefits.

Reversed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Justice Terry N. Trieweiler dissenting.

The language in Article II, Section 4, of Montana's Constitution is simple, plain, and clear. It provides that "[t]he dignity of the human being is inviolable. No person shall be denied the equal protection of the laws." Yet, the purpose served by that language in any society based on equality is absolutely vital. It recognizes that majoritarian rule can at times be harsh, intolerant, and unfair. It recognizes that at times a basic framework of principle is necessary to prevent those with political influence from oppressing those without political influence.

In recent years in Montana, no group has had less political influence and been the subject of more political demagoguery than those unfortunate people injured and disabled during the course of their employment. No group has had greater influence than those employers, led by the State's newspaper publishers, who consider injured workers an unnecessary business expense and an obstruction to the ever elusive "better business climate" that they seek for the State of Montana.

Sadly, today's decision by the majority sounds the death knell for this critical constitutional protection which powerless people have traditionally relied on courts to enforce.

Based on the majority's decision in this case, discriminatory laws in Montana need have no rational basis in fact so long as a majority of the members of this Court can contrive some speculative basis to support such discrimination.

12

To understand the human impact of today's decision and of the anti-claimant hysteria that is sweeping this State, it is necessary to know more about the circumstances of Gary Stratemeyer than is evident from the majority opinion.

Stratemeyer is a 41-year-old former deputy sheriff in Lincoln County. He has a wife and a son. In late 1988 or early 1989, he was promoted to the rank of sergeant.

On May 4, 1990, Officer Stratemeyer received a call from the dispatcher who advised him of a reported suicide. Although he had been in law enforcement for eight years, he had never previously responded to a suicide attempt. However, he responded immediately.

On his way to the location where the suicide was reported, Stratemeyer learned that the young girl who had attempted to take her life was still alive. When he arrived at the home where the attempt had occurred, he entered the bedroom where she was located and observed that "there was blood everywhere." Stratemeyer found the victim, a 17-year-old girl, being held by her father who was rocking her back and forth and telling her to keep breathing. Observing that the father was unable to help her, Stratemeyer forcibly took the girl from her father's arms and began administering cardiopulmonary resuscitation. He continued doing so, holding the dying young woman in his arms, until the ambulance arrived. When the ambulance arrived, Stratemeyer carried the girl to a gurney so that she could be transported to the hospital.

After escorting the ambulance to the hospital, Stratemeyer returned to work and was dispatched to an accident. However, before the shift ended, he was informed that the girl had died.

That night, and for several days and nights thereafter, Stratemeyer was plagued by the memory of the dying girl and her father. He second guessed the wisdom of taking the girl from her father's arms during the last moments of her life. He continued to report to work, but began to experience an inability to concentrate and mental disorientation. He became increasingly distraught and developed emotional problems that interfered with his work and his personal life. He could not sleep, was continuously exhausted, and felt the need to escape the town in which he lived and worked.

Finally, on May 14, 1990, he was taken to the hospital by ambulance in a tearful state where the psychologist who examined him observed that "[h]e was obsessing about the suicide of the young girl, the flashback of her face superimposed on that of his son's, he feared he was going crazy . . . ."

Stratemeyer was given a tranquilizer and diagnosed with post traumatic stress disorder.

Prior to the traumatic experience that he had during the course of his employment on May 4, 1990, Stratemeyer was known as an outstanding member of the Lincoln County Sheriff's Department. He was self-sufficient and conscientious. He was capable of supporting himself and his family. He is now markedly dysfunctional, unable to return to work, and unable to function normally in his personal life. His physical symptoms include

14

problems with his stomach, diarrhea, and periodic vomiting. He experiences periodic tingling and numbness in his arms.

His employer does not dispute the nature of his mental injury nor the extent of his disability. Nor is there any doubt that his injury resulted from an unexpected traumatic incident identifiable by time and place of occurrence, caused by a specific event on a single day and identifiable by the body part affected. The only reason that he is denied compensation for his disability is the fact that his injury is to his mind, rather than to some other part of his body. Had Stratemeyer injured his back while carrying this 17-year-old girl to the ambulance, the consequences to him and his family may have been much less significant. However, Montana's workers' compensation laws would have provided him full medical coverage for his injuries and disability benefits so long as his earning capacity was affected. This type of legislative injustice is exactly what the equal protection clause was intended to prevent. Yet, because of the majority opinion, future Gary Stratemeyers will have no constitutional protection in Montana from similar discriminatory treatment by legislators anxious to please influential constituents.

The majority opinion is the best example yet for the belief by many constitutional scholars that the "rational basis" test is no test at all. Based on the majority opinion in this case, it can clearly be said that the determination of which standard of review applies determines the outcome of any equal protection analysis under Montana constitutional law. Under the majority's "rational

15

basis" standard of review, the Legislature need offer no reason for its discriminatory classifications. The beneficiary of the discrimination need offer no evidence in District Court that the statutory distinction is rationally related to a legitimate government objective, and the District Court need have no factual or evidentiary basis for upholding discriminatory legislation.

According to the majority opinion, the only limit on the Legislature's authority to draw arbitrary classifications among its citizens is the creative ability of the majority of the justices on this Court. If the majority can imagine some speculative but unsubstantiated basis for discriminating among Montana's citizens, then it is okay for the Legislature to do so. Under this standard, the notion of equal protection in our Constitution is truly illusory.

The major problem with the majority's reasoning is that it proceeds from the faulty assumption that it is limited to a two-tiered analysis of equal protection cases. Limiting the Court's scope of review to a two-tiered analysis has been discredited long ago in both federal and state case law, and for good reason.

As pointed out by Justice Marshall in his dissent in *Massachusetts Board of Retirement v. Murgia* (1976), 427 U.S. 307, 318, 96 S. Ct. 2562, 2569, 49 L. Ed. 2d 520, 527-28 (Marshall, J. dissenting):

> Although there are signs that its grasp on the law is weakening, the rigid two-tier model still holds sway as the Court's articulated description of the equal

16

protection test. Again, I must object to its perpetuation. The model's two fixed modes of analysis, strict scrutiny and mere rationality, simply do not describe the inquiry the Court has undertaken--or should undertake--in equal protection cases. Rather, the inquiry has been much more sophisticated and the Court should admit as much. It has focused upon the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the state interests asserted in support of the classification.

Although the two-tier model employed by the majority offers a simple mechanical approach to equal protection analysis, Marshall very clearly explained the inadequacy of such an approach for enforcing this important constitutional right. He pointed out that:

> If a statute invades a "fundamental" right or discriminates against a "suspect" class, it is subject to strict scrutiny. If a statute is subject to strict scrutiny, the statute always, or nearly always, see *Korematsu v. United States*, 323 U.S. 214 (1944), is struck down. Quite obviously, the only critical decision is whether strict scrutiny should be invoked at all. . . .
>
> But however understandable the Court's hesitancy to invoke strict scrutiny, all remaining legislation should not drop into the bottom tier, and be measured by the mere rationality test. For that test, too, when applied as articulated, leaves little doubt about the outcome; the challenged legislation is always upheld. It cannot be gainsaid that there remain rights, not now classified as "fundamental," that remain vital to the flourishing of a free society, and classes, not now classified as "suspect," that are unfairly burdened by invidious discrimination unrelated to the individual worth of their members. Whatever we call these rights and classes, we simply cannot forego all judicial protection against discriminatory legislation bearing upon them, but for the rare instances when the legislative choice can be termed "wholly irrelevant" to the legislative goal. *McGowan v. Maryland*, 366 U.S. 420, 425 (1961). [Citations omitted.]

*Murgia*, 427 U.S. at 319-20.

17

It is no wonder that in *The Supreme Court 1971 Term--Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection* 86 Harv. L. Rev. 1, 8 (1972), Professor Gerald Gunther observed that the Warren Court applied either "scrutiny that was 'strict' in theory and fatal in fact," or "minimal scrutiny in theory and virtually none in fact." The minimal scrutiny applied by the majority in this case was in fact no scrutiny.

Perhaps in response to the legitimate concerns articulated so clearly by Justice Marshall, the U.S. Supreme Court recognized a middle tier of analysis in *Plyler v. Doe* (1982), 457 U.S. 202, 102 S. Ct. 2382, 72 L. Ed. 2d 786. In that case, the State of Texas denied the children of illegal aliens free public education. The question presented to the Supreme Court was whether that denial was consistent with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In concluding that the Equal Protection Clause was violated, the majority of the Court recognized that undocumented aliens are not a suspect class and that education is not a fundamental right. Therefore, the discriminatory classification reviewed in that case was not subject to strict scrutiny. However, the Court also recognized that because of the importance of education in the lives of children, and because of the significant social costs when selected groups are denied an education, an intermediate level of scrutiny would be applied. As part of that intermediate level of scrutiny, the Court held that the burden would be on the State of Texas to prove that

the discriminatory classification furthered some substantial goal of the State. Finding no evidence in the record of such a substantial interest, the Court held that:

> If the state is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest. No such showing was made here. Accordingly, the judgment of the Court of Appeals in each of these cases is *Affirmed*.

*Plyler*, 457 U.S. at 230.

In analyzing the circumstances which will give rise to the heightened level of scrutiny applied by the Supreme Court in the *Plyler* decision, Lawrence Tribe offers the following explanation:

> Broadly speaking, there are two circumstances that trigger heightened scrutiny. The first involves infringement of "important," although not necessarily "fundamental," rights or interests. The extent to which the Court's scrutiny is heightened depends both on the nature of the interest and the degree to which it is infringed. Thus, in *Plyler v. Doe*, the Court adopted a requirement that the state's goal be "substantial" when faced with a classification which served to deprive illegal alien children of any education, an interest which the Court explicitly held to be "important" in "maintaining our basic institutions." Significant in the Court's decision to heighten scrutiny was the risk that such deprivation would serve to "create and perpetuate . . . a subclass of illiterates within our boundaries."
>
> Likewise, in *Hampton v. Mow Sun Wong*, infringement of the interest of aliens in employment in the federal competitive civil service was struck down specifically because of how broadly the "liberty" of aliens is restricted by their exclusion from such a large part of the economy. . . .
>
> . . . .
>
> A second broad circumstance in which intermediate review has been triggered involves government's use of

19

sensitive, although not necessarily suspect, criteria of classification.

Lawrence Tribe, American Constitutional Law, § 16-33 (2d Ed. 1988).

Similarly, our Court has recognized a middle tier of analysis where important rights are involved, even though those rights are not considered fundamental. In *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311, this Court was asked to decide whether legislation which linked eligibility for welfare benefits to a person's age violated the Equal Protection Clause found in Article II, Section 4, of the Montana Constitution. We noted that:

> Equal protection analysis traditionally centers on a two-tier system of review. If a fundamental right is infringed or a suspect classification established, the government has to show a "compelling state interest" for its action. If the right is other than fundamental, or the classification not suspect, the government has only to show that the infringement or classification is rationally related to a governmental objective which is not prohibited by the Constitution.

We held that to be a fundamental right under Montana's Constitution, the right must be found in Montana's Declaration of Rights or be a right "without which other constitutionally guaranteed rights would have little meaning." *Lewis*, 712 P.2d at 1311. We held that although mentioned in the Constitution, the right to welfare was not a fundamental right. However, since it was an important enough right to be mentioned elsewhere in the Constitution, we held that its abridgement required something more than a rational relationship to a governmental objective. We stated that:

20

A need exists to develop a meaningful middle-tier analysis. Equal protection of the law is an essential underpinning of this free society. The old rational basis test allows government to discriminate among classes of people for the most whimsical reasons. Welfare benefits grounded in the Constitution itself are deserving of great protection.

. . . Where constitutionally significant interests are implicated by governmental classification, arbitrary lines should be condemned. Further, there should be balancing of the rights infringed and the governmental interest to be served by such infringement.

*Lewis*, 712 P.2d at 1314.

For these reasons, we adopted the following standard of review for those interests which we deemed significant enough to warrant a middle tier of analysis:

We hold that a finding that HB 843 is constitutional requires the State to demonstrate two factors: (1) that its classification of welfare recipients on the basis of age is reasonable; and (2) that its interest in classifying welfare recipients on the basis of age is more important than the people's interest in obtaining welfare benefits.

*Lewis*, 712 P.2d at 1314.

Based upon that test, we held in language relevant to the issue raised in this case that:

[T]he State's objective in enacting HB 843--saving money--must be balanced against the interest of misfortunate people under the age of 50 in receiving financial assistance from the State. The trial record does not show the State to be in such a financially unsound position that the welfare benefit, granted constitutionally, can be abrogated.

*Lewis*, 712 P.2d at 1314.

In *State ex rel. Bartmess v. Board of Trustees of School District No. 1* (1986), 223 Mont. 269, 275, 726 P.2d 801, 804-05, we reaffirmed our commitment

21

to a middle tier of scrutiny and held that a high school student's right to participate in extra-curricular activities was an interest of sufficient magnitude that its abridgement would warrant middle-tier scrutiny, rather than simply speculation about a rational basis. We stated that:

> We therefore hold that the middle-tier constitutional analysis is to be applied in determining whether the 2.0 rule violates students' right to participate in existing extracurricular activities. We further hold that this right is not a fundamental right under the Montana Constitution; but that such right is clearly subject to constitutional protection and that a middle-tier analysis is to be applied for constitutional equal protection purposes.

Based on our previous decisions, the fact that there is no fundamental right to those disability benefits provided for in the Workers' Compensation Act should not be the end of our equal protection analysis. The interest of an injured worker in a disability benefit with which to sustain himself and his family is of sufficient magnitude that the denial of those benefits based on an arbitrary classification deserves a higher level of scrutiny than is provided for under the majority's toothless "rational basis" test.

The benefits provided for under the Workers' Compensation Act will, in many cases, be the difference between a family's subsistence and its financial ruin. The ability to provide for a family's housing, transportation, food, and clothing may depend on an injured worker's entitlement to disability benefits. The eligibility for health care expenses alone may be the difference between a family's survival and destruction.

22

The public policy consideration for workers' compensation benefits is clearly stated in § 39-71-105(1), MCA, which provides that:

> It is an objective of the Montana workers' compensation system to provide, without regard to fault, wage supplement and medical benefits to a worker suffering from a work-related injury or disease.

The vital importance of a basic disability benefit for injured workers in Montana is so clearly evident as a matter of public policy that all but a few exempt employers are required by law to provide coverage under the Workers' Compensation Act for their employees. Section 39-71-401, MCA. The failure to provide coverage is a felony punishable by ten years in prison and a $50,000 fine. Section 45-7-501, MCA. This requirement is considered so significant to the social and economic well-being of our citizens that employers who fail to carry workers' compensation insurance can be ordered to completely cease operation of their business until they elect to be bound by a compensation plan. Section 39-71-507, MCA. Any employer who fails to comply with an order to cease operations is guilty of a misdemeanor.

Certainly the interest of an injured and disabled worker in his or her disability benefits is as significant as an alien child's interest in education, the right of other Montana citizens to welfare benefits, and the right of school children to participate in extra-curricular activities. To argue otherwise is to ignore the despair and futility experienced by any family whose primary wage earner has lost the ability to provide his or her

23

family with financial support. To hold otherwise is to ignore the reality that unless disabled workers are compensated for their disability by the industry in whose service they were damaged, the obligation to support these workers and their families falls upon the taxpayers in general who have had no direct benefit from the worker's services, and who have a much less compelling obligation to contribute to that unfortunate family's subsistence.

Under the heightened middle-tier scrutiny that I would apply to the Legislature's arbitrary denial of disability benefits to Gary Stratemeyer, the decision of the Workers' Compensation Court would necessarily be affirmed. Under that level of scrutiny, the burden would be on the State of Montana to show that this discriminatory classification is reasonable and that the State interest served is more important than Gary Stratemeyer's interests in these basic disability benefits. There is no such evidence in the record before this Court.

No purpose for this discriminatory legislation was offered by the Legislature. No purpose was demonstrated by Stratemeyer's employer in the trial court. The Workers' Compensation Judge was left to speculate without any factual or evidentiary basis to justify treating injuries to the mind differently from injuries to the back or leg.

Since the trial judge found no justification for this discriminatory treatment, the majority has manufactured justifications. The majority speculates that excluding injuries to the mind from coverage under the Workers' Compensation Act might be cost

effective. The same could be said for excluding injuries to the left leg, as opposed to the right leg, or excluding injuries to the neck. Presumably, if the Legislature chooses to do so, the majority would have no difficulty finding a rational economic basis for its decision.

The majority's effort to rationalize discriminatory treatment of the claimant is speculative at best. We have no evidence in this record of the frequency of claims for stress prior to the 1987 amendment to the Workers' Compensation Act, nor do we have any evidence of the overall impact that such claims had or would have on the cost of providing workers' compensation coverage to the average employer in Montana. What we do know is that the impact of such an injury on this claimant has been devastating and that his family's need for disability benefits is desperate.

What we also know from the public information that has been disseminated is that since allegedly "cost saving measures" like this one were enacted in 1987, the unfunded liability of the State Compensation Insurance Fund has quadrupled and rates for workers' compensation coverage for most employers in Montana have increased by 100 percent.[1] There is good reason why the majority has found it necessary to substitute its own speculation for any factual record in this case.

The majority also surmises that a rational basis for excluding mental injuries from coverage under the Workers' Compensation Act

---

[1]Chris Sykes, *A Heavy Toll: What Workers' Comp Costs and How Montana Rates*, GREAT FALLS TRIBUNE. Feb. 14, 1993, at 4A.

may be the fact that mental injuries are more difficult to prove than physical injuries. However, this is a poor case in which to assert that argument. The claimant's injury in this case and the extent of his total disability is uncontested by his employer or its insurer. Neither was there any basis in the legislative history for § 39-71-119, MCA, to conclude that mental injuries were excluded because of the difficulty proving them. The notion that mental injuries are difficult to prove and document is a carry-over from the dark ages. In the modern practice of psychiatry and psychology, there are many objective tests for the documentation and measurement of mental disease or defect. Conversely, in spite of many advances in medicine, there are no objective means of documenting or measuring many types of physical injuries, including injuries to muscles, ligaments, tendons, and nearly every other soft tissue found in the human body.

Any conclusion that difficulties with proof are a justification for excluding mental injuries from coverage under the Workers' Compensation Act finds support only in the editorial pages of this State's daily newspapers which, for the past year, have bullied and threatened this State's courts over the issue presented in this case.[2] These uninformed opinions are certainly no basis for

---

[2]Editorial, *Stress Could Break Workers' Comp Bank*, GREAT FALLS TRIBUNE, May 19, 1992, at 4A.
Editorial, *Court Cases Add to Work-Comp Woes*, INDEPENDENT RECORD, May 24, 1992, at 5C.
Editorial, *They're Stressed Out in California*, INDEPENDENT RECORD, Jan. 31, 1993, at 5C.

26

resolving a constitutional issue of the magnitude that this case presents.

The majority opinion is based on an inadequate and faulty analytical approach to the Equal Protection Clause of the Montana Constitution. It employs an approach which for all practical purposes eliminates the protections provided for in Article II, Section 4, of the Montana Constitution, by concluding that virtually any reason will justify the discriminatory treatment of Montana's citizens under Montana's laws. For these reasons, I dissent from the opinion of the majority. I would affirm the Workers' Compensation Court.

_____
Justice

Editorial, *Letter to Marc Racicot and Montana State Legislature From Tribune Editorial Board*, GREAT FALLS TRIBUNE, Feb. 16, 1993, at 6A.

Editorial, *Ten Steps Needed to Cure Workers' Comp*, GREAT FALLS TRIBUNE, Feb. 17, 1993, at 6A.

27

Justice William E. Hunt, Sr., dissenting.

I dissent. Like Justice Trieweiler, I can find no evidence to support the erroneous conclusion of the majority opinion. If giving benefits to a dedicated police officer, injured in the performance of his duty while trying to save the life of a young girl, requires more than claimant has provided here, we are indeed in woeful economic straits.

I would affirm the Workers' Compensation Court.

_____
Justice

28

June 23, 1993

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Norman H. Grosfield
Utick & Grosfield
P.O. Box 512
Helena, MT  59624-0512

Sydney E. McKenna
Patterson, Marsillo, Tornabene, Schuyler & McKenna
103 So. 5th East
Missoula, MT  59801

Charles G. Adams, Legal Counsel
State Comp. Mutual Ins. Fund
P.O. Box 4759
Helena, MT  59604

Robert E. Sheridan
Garlington, Lohn & Robinson
P.O. Box 7909
Missoula, MT  59807-7909

John J. Richarson, Esq.
BECK LAW OFFICES
Aspen Professional Center
1700 West Koch, Suite 2
Bozeman, MT  59715

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
    Deputy